## THE CAMANCHE.

1. A corporation is not disqualified, by the simple fact of its being a corporation, from maintaining a suit for salvage. Hence, where a service, in its nature otherwise one of salvage, was performed by a stock company, chartered to hire or own vessels manned and equipped to be employed in saving vessels and their cargoes wrecked, and to receive compensation in like manner as private persons, and where the persons actually performing the service had no share in the profits of the company, but were hired and paid under permanent and liberal arrangements and rates of pay—the net profits being divided among stockholders —such service was held to be a salvage service, and the corporation to be entitled to pay as salvors accordingly.

2. A suit for salvage cannot be abated on the objection of claimants that others as well as the libellants are entitled to share in the compensation.

The remedy of such others is to become parties to the suit, or to make a claim against the proceeds, if any, in the registry of the court.

3. The defence, that the services for which salvage is claimed were rendered under an agreement for a fixed sum payable in any event, is waived unless set up in the answer, with an averment of payment or tender.

4. Nothing short of a contract to pay a fixed sum at all events, whether successful or unsuccessful, will bar a meritorious claim for salvage.

5. A salvage service is none the less so, because it is rendered under a contract which regulates the mode of ascertaining the compensation to be paid, but makes the payment of any compensation contingent upon substantial success.

6. Decrees in salvage will not be disturbed as to their amount, unless for a clear mistake, or gross over-allowance of the court below.


APPEAL from the Circuit Court for California.

The case was this:

In November, 1863, in the midst of a violent southeast gale, the ship Aquila, then but a few days in port, sunk at her moorings in deep water, alongside her wharf, in San Francisco. She had just hauled in there to discharge her cargo, consisting of the materials and armament—shot, shells, guns, ordnance, stores, &c.—of the monitor Camanche, which was to be constructed under contract with the government by Donahue & Ryan, who owned both the Aquila and the whole cargo sunk.

The materials, armament, &c., were valued at $400,000. Of this, $340,000 were insured by various companies, each having a certain part of the risk. This left $60,000 at the risk of Donahue & Ryan, the owners.

The Aquila had been anxiously expected at San Francisco with her cargo. Her foundering in an exposed and difficult part of the bay, made the loss of the monitor highly probable. The public mind, excited by the civil war then raging, and by fears of attacks by hostile cruisers on a harbor and city inadequately defended, was shocked by the shipwreck of the only sure means of protection provided by the government for both; and this feeling extended itself throughout the country.

Measures were promptly taken to save, if possible, the vessel and cargo. Donahue & Ryan, who owned her and

the cargo, and had contracted to build the monitor, then in San Francisco, of which they were residents, made within a day or two after the Aquila sunk, an abandonment of ship and cargo to the agent of the underwriters at San Francisco.

The agent did not accept, but took vigorous measures to save the property. The government superintendent for the building of the monitor was early on the ground and was active.

The best mechanics of the city were contriving measures. A dry-dock was thought of, and plans were drafted. The first attempt actually made was by pumping out the ship. This was after full consultation. It proved unsuccessful. The next attempt was to lift the ship by chains under her bottom. Different modes of getting these under were tried by divers: by blowing a hole underneath, &c.; all in vain. This attempt, like the other, was abandoned.

These efforts were continued several weeks, at a cost to the underwriters of $38,000 in gold, but were finally given up. Ryan, one of the contractors, bore a leading part in these operations; had charge of the pumping process, and received $1000 for his services.

In this juncture, the efforts at San Francisco having proved abortive, a company called the Coast Wrecking Company, agreed at New York, with the underwriters, to undertake the recovery of the materials of the monitor.

The peculiar character of this company, and their agreement in the case—matters, both of them, much discussed in the argument—must here be stated.

The company was an *incorporated stock company*, incorporated by the legislature of the State of New York, and invested by their charter with authority to hire or own vessels manned and equipped, to be employed in towing, aiding, protecting, and saving vessels and their cargoes wrecked or in distress, whenever such wrecks or distress occur, and to receive compensation or salvage for such services in like manner as *private persons*, and entitled to like liens and remedies.

The location of the company was in the city of New York, and its chief business was with the cruising grounds of the large Eastern ports. Its business of wrecking or salvage was conducted exclusively by vessels, equipments, and materials supplied and paid for out of the corporate funds; and the officers and men executing the work done, did not participate in the losses or gains springing out of the services rendered on the occasion of their employment; but, of whatever rank and position, were paid by the corporation, and out of its funds, as in cases of pure contracts of hiring.

The company was in the habit of paying to its agents and servants who were engaged in services of difficulty or danger, a rate of wages or salary proportionately high, and in case of injury to any of them while so engaged, its practice was to take care of them till they recovered, and in case of their death, to take care of their families, and to place them or their families, as the case might be, in a position to earn a livelihood. It also paid the medical bills of men hurt in its employment.

The rate of wages paid was high in proportion, and above pay for mere work and labor. Merritt's (the captain) salary was $4500 a year, with primage (for the service in this case, about $1500 to $2000), besides all expenses paid. His assistant had $1200 a year, and $500 primage. He and the others who went out with the expedition had all their expenses paid from the time they left New York until they returned. The principal divers averaged $13 a day, for the same time out and back; their day's work being four hours; besides expenses paid. The divers regularly employed by the company were on half pay while not engaged in service.

The agreement which the company made, was between itself and different insurance companies who had taken risks on the *cargo*, to raise *it* for $110,000, to be paid by the companies, each in proportion to its interest in the $400,000 valuation, insured; the Wrecking Company agreeing to complete the work in ten months, with a proviso, however, that if not completed in that time, the company should for-

feit ten per cent.; and, also, that if there was no substantial recovery, the Wrecking Company should receive nothing. The proviso as to time was made because a cargo of the nature that this was, would, as to part of it, be injured by remaining long in water.

The agreement being made, the Wrecking Company promptly despatched to San Francisco a party of men, divers and wreckers, specially selected from New York, Boston, and Providence, and fully provided with suitable apparatus and machinery; the whole under the command of Captain Merritt, the company's general superintendent, a man of twenty years' experience, and of admitted skill in his calling.

The expedition left New York, December 24th, 1863, and arrived in San Francisco, January 17th, 1864. Captain Merritt on the 23d of January received possession of the wreck, and on the 25th of January, after examination and study as to the best plan, began operations.

The winter had just begun, and there was reason to expect cold and stormy weather. The ship, as she lay, was exposed to the southeast gales of the season, one of which had sunk her, with the rake of the bay for thirty miles, and to its currents. She lay ten feet from the wharf, with a list to starboard (off-shore) of forty-five degrees; pitched by the head at thirty to thirty-two degrees. Her forward part, for one-third of her length, projected beyond the end of the wharf, with the bow exposed to the force of the tides and currents. Her bow was sunk in forty-eight to fifty feet of water; her stern in about nineteen feet. At low water about one-sixteenth of her deck was out of water; at high water she was submerged, except a space on one side, close astern. In effect she was at the bottom of the bay, and at such angles of inclination fore and aft, and from side to side, as to make it, independent of the depth of water and the darkness, somewhat difficult to stand on her decks, and even more difficult to work at getting out her cargo. Besides, she rested on a rocky bottom, shelving off shore; making her liable, if her fasts should part at any time, to slip off into deeper water.

Besides the difficulties of the ship's position, the cargo was perplexing in its character and in its stowage.

The materials of the monitor comprised a great number of iron pieces, from twenty-six tons to one hundred pounds in weight. The frame was of angle-iron, long, crooked pieces, very difficult to handle. Floor timbers, also of iron, were of irregular shape, and some very heavy and long. There were two main engines for propelling the monitor, and eight smaller engines. The guns weighed twenty-two tons each, and there was a number of shot and shell. The guns, as well as the other heavy pieces, as *ex. gr.*, the pilot-house, twenty-six tons, were liable, in the progress of loosening and getting out the cargo, to break away and do great damage. There were also a multitude of construction tools, machinery for a machine shop, and small pieces, bolts, rivets, &c., by thousands. The weight of the whole was fourteen hundred tons.

By reason of the very unusual nature, construction, value, and weight of the cargo, and to keep it from shifting, extraordinary means and care had been used in the stowage of it. It was " stowed down solid," " firmly fixed in the hold," shored by staunchions or joists, one end resting under the deck-beams, and the other resting on the cargo or the flooring over the cargo, in such angles and positions as required, and some of them tied with braces; the whole thoroughly wedged in. The stowage was such, as in the opinion of Mr. Ryan, one of the claimants, to make it impossible to remove the cargo with divers.

After full examination, the plan adopted by Merritt and his company, was to get out the cargo by divers, as far as necessary, and then to raise the ship, lay her on the flats, and hoist out the remaining cargo. It was considered impracticable to raise the ship with the cargo in her.

The first part of the work, getting out the cargo by divers, was commenced January 28th, 1864, and by unremitting labor from early in the morning until late at night, except two and a half days stormy and Sundays, it was completed about April 20th, 1864; somewhat less than three months.

The risk of life and limb during this part of the labor, was testified to be "great and constant." "The divers were obliged to work in entire darkness, and the inclination of the deck both ways, and the mud which rendered it slippery, made it impossible for them to walk, and compelled them to crawl by a line on the weather or upper side of the ship. Yet they had to follow up every piece to the hatchway. To find and hook on the pieces to be hoisted out, they had to grope their way in the dark, and feel with their hands all over each piece. This part of the operations was peculiarly dangerous. With the utmost care in breaking away the timbers which formed the stowage of the cargo, it was almost impossible to prevent the heavy pieces on the upper side of the ship from fetching away. One of the large guns, weighing twenty-two tons, fetched away in this manner. One of the long, crooked iron ribs, coming away, cut off a finger of an experienced diver, who had just hooked it on. He dived no more. Many of the pieces had sharp edges, so that if one of them had struck a diver in a vital part it must have killed him."

In getting out the cargo the ship was necessarily a good deal injured. Holes had to be cut in her. But her value bore no comparison at all to that of the cargo.*

After the cargo was got out, the raising of the ship was undertaken. The attempt was first made to get chains under her. This failed, as she rested forward so heavily on the rock that the divers, after working two days with picks, &c., could not get the chains under her. Another plan was tried, and succeeded, that of lifting her with chains fastened to the deck-beams and other parts of the ship, and hove through pontoons, with levers worked by powerful hydraulic machines, until the bow was raised from the bottom, so that chains could be introduced under her whole length. The

---

* The testimony did not, so far as the reporter saw, show what would have been the value of the vessel independently of what she suffered in the process of getting the cargo away. She was worth $30,000 when she left her port of departure, New York; and, after being raised, sold for $4900. But she had apparently been injured by another vessel after she sank.

chains were worked in the same way through the pontoons. About the 20th of May, after a month's incessant work, day and night, Sundays included, the ship was raised and floated upon the flats.

Steps were then taken for pumping her out. By means of a large hole made in the mud under her, the divers stopped the leaks; the ship was pumped out by steam, the mud removed, and the remaining cargo hoisted out. Captain Merritt, with some of his men, returned to New York about the middle of June, 1864, and the last of the materials were landed July 3d. The duration of the salvage service, from the time of leaving New York until its completion, was about six months and a half, or until the return to New York, over seven months. The outlay made by the company in its work of recovering the cargo, was nearly $70,000; all of which, but $5300, was consumed in the enterprise.

The Aquila, or vessel on which the cargo had been shipped, was raised by the Wrecking Company, though the main matter to which attention was directed was the cargo, which from the character of a part of it (fine machinery and polished metal), it was indispensable to get from under the water at once, and this necessity for expedition interfering somewhat, perhaps, with the recovery of the vessel itself in the best condition, and along with the cargo.

All the insurance companies (except one which had a risk for $15,000 and had failed) paid the money which by the terms of their contract they were bound to pay; but there remained over and above *their* interest in the cargo, the $60,000 uninsured. For rescuing this, the Wrecking Company claimed salvage of the owners, Donahue & Co. These refused to pay. Thereupon the company filed a libel in the District Court for Northern California, to have salvage for this $60,000 saved, and for the $15,000 insured on the cargo by the broken company, and a monition issued in due form, to every one having anything to say, to come in. Donahue & Ryan answered, admitting in effect the recovery of the cargo, but denying the vast and unheard of peril, difficulty, and labor alleged; and setting up that the Wrecking Company

had paid very little regard to what damage they did to the Aquila, and had seriously and lastingly injured her; without setting up, however, either as a fact or fear, that the individual men, who performed the actual labor, would make a claim for salvage. No tender of money for anybody was made.

The District Court, regarding the service as a salvage service, awarded on the two items $24,062, and the Circuit Court affirmed the decree, with interest at seven per cent. from the beginning of the suit. And from this decree the appeal came.

*Mr. Ward, for the owners, appellants:*

1. *The libellant in this case cannot be a salvor.* A salvor is one who renders *personal* service. In *The Lively,** an agent, at a seaport where a vessel had run ashore, being applied to by the master, and having hired and employed persons to unload the vessel and get her afloat, sued as a salvor. It was held that his claim could not be sustained. Dr. Lushington, giving judgment, said:

"The whole records of this court show that a claim of this description cannot be allowed. . . . . . If I were to sanction a claim of this description, the inevitable consequence would be this, that in every case where an accident occurred in the neighborhood of the various seaports of this country, and any agent was applied to, to hire a steamboat or hire sailors to go on board to render assistance, he would be entitled to come to this court and sue as if he were himself a salvor, he personally doing nothing to effect the salvage. I believe, over and over again, when such attempts have been made—and there have been two or three in my experience—every judge of this court has set his face decidedly against them."

In *The Charlotte†* it was distinctly held that no claim for salvage remuneration, properly so called, can be maintained

* Notes of Cases in Ecclesiastical and Maritime Courts, H. T. 1848 to H. T. 1849, p. 206.

† Ib. 279.

by parties not personally engaged in the service. Dr. Lushington, in giving judgment, said:

"I now come to the other point, namely, who are the salvors? Two of the persons by whom the claim is made are William and John Thomas. Why? On the ground that they had command over the boats and the command over the crews, and sent them out, but did not go themselves. Is that a salvage service? I apprehend clearly not, and that principle has been laid down. It is alluded to by Lord Stowell in *The Vine*, but though he merely alludes to it in that case, it is a principle which has been settled over and over again, from the earliest period of my practice in this court. The principle is this, that a party is not entitled to be considered as a salvor who stays on shore and sends his own boats and his own crews. . . . Lord Stowell laid down that in order to entitle a person to claim as salvor, he must have been personally engaged in the service; but he also laid it down that persons contributing to a salvage service by furnishing boats or other articles, should be entitled to remuneration, not as salvors, but for the use of the articles they supplied. That is the general principle, and from that principle I am not prepared, in the slightest degree, to recede."

Decisions by district judges are, of course, of no authority here. Yet, on admiralty questions, they often deserve the highest respect. We therefore mention that in *The Stratton Audley*, where this very Coast Wrecking Company was the corporation spoken of, Judge Blatchford says, "Nor can the corporation itself be a salvor. It cannot hire persons on wages and claim salvage for services rendered by those persons;" and this principle was also declared by Betts, J., in *The Morning Star;* Nelson, J., affirming him.

2. *If this libellant can be a salvor, it is not the sole salvor; and payment to it would be no protection to the claimants against its employees.*

In *The Britain** an agreement was entered into between the masters of the salving vessel and the vessel salved:

"That it shall be left to the decision of arbitrators, to be

---

* 1 W. Robinson, 40.

named by each party, to fix the amount of remuneration that is due Sulling, the master of the Fortitude, as well for his vessel as for himself and his crew, for the services rendered and loss of time, and likewise what shall be due them in indemnification of the expenses incurred by having put into the harbor of New Deep; and both parties renounce the right of any higher appeal."

The arbitrators awarded £420, which was paid by the owners of the salved ship. Yet upon a libel by the crew of the salving vessel, setting forth that they had not been paid for their services, Dr. Lushington awarded £383, 11s. 6d. (upon the basis of the arbitrator's award), to be paid by the owners of the Britain; and he said that "they must recover from the owner of the Fortitude the sum which has already been paid by them into his hands."

So in *The Sarah Jane*,* where salvage of £800 was paid to the master of the salving vessel, under an agreement between the owners and masters of such vessel and the owner of the vessel salved, action was successfully sustained by some of the crew of the salving vessel, dissatified with the distribution of the £800 so paid; Dr. Lushington concluding his judgment in these words:

"I regret much the hardship that will be experienced by the owners of the Sarah Jane, in thus being called upon a second time to pay a salvage remuneration. At the same time, I hope it will be a warning in future cases, that owners cannot safely enter into a compromise of this description, which includes the interests of all persons that have rendered service to their vessel, without procuring a release from all parties interested, or incurring a risk of the consequences. In the present instance the owners of the Sarah Jane have chosen to encounter the risk of these consequences, and these consequences they must bear, for I cannot, as a matter of indulgence to them, inflict legal hardship upon others."

3. *This is not a case of salvage service. A contract was made for a sum certain, in consideration of which the service was to be*

---

* 2 W. Robinson, 110; and see The Centurion, Ware, 483.

*performed.* Salvage means a compensation earned by persons who *voluntarily* assist in saving a ship or her cargo from peril. In *The Calypso*,* Sir Christopher Robinson said:

"All salvage is founded on the equity of remunerating spontaneous services."

And again:†

"Considering all salvage to be so founded on the equity of remunerating private and individual services, a court of justice should be cautious not to treat it on any other principle."

In the case of *The Neptune*,‡ Lord Stowell defines a salvor to be "a person who, without any particular relation to a ship in distress, proffers useful service, and gives it as a *volunteer adventurer*, without any pre-existing covenant connecting him with the duty of employing himself for the preservation of that ship."

And in *The Mulgrave*,§ he held that an agreement for a sum certain vitiates any claim for salvage; and would not consider the question where a contract existed.

In *The Helen and George*,‖ Dr. Lushington, in rendering the decision of the court, said:

"The principle on which the court acts is, that if satisfied that any agreement has been made, it will carry it into effect, unless totally contrary to justice and the equity of the case."

In *The Firefly*,¶ upon a defence before the same judge, to a claim for salvage, a parol agreement was alleged to have been made by the master of a stranded vessel with the salvors, during a raging storm, and whilst both parties were on board their respective crafts. There was a total denial of such an agreement on the part of the alleged salvors, and the testimony *pro et contra*, was evenly balanced. Yet the agreement was sustained.

---

* 2 Haggard's Admiralty, 217.　† Ib. 218.
‡ 1 Id. 236.　§ 2 Id. 77.
‖ 1 Swabey, 369.　¶ Ib. 241; and see Ib. 226.

These doctrines of the English courts were adopted in the first circuit, where, in *The Independence*,* Curtis, J., said:

" In my judgment, a contract, to be paid at all events, either a sum certain or a reasonable sum, for work, labor, and the hire of a steamer or other vessel, in attempting to relieve a ship in distress, without regard to the success or failure of the efforts thus procured, is inconsistent with a claim for salvage; and when such a contract has been fairly made, it must be held binding by a court of admiralty, and any claim for salvage disallowed."

4. *The amount allowed in this case violates the established principles of law and justice regulating compensation for salvage.*

The arrangement made in this case was made with the owners of the cargo, to get a large salvage at the sacrifice of the ship. Such agreements tend to fraudulent bargains, and are not allowed.†

It is no answer to say that appellate courts do not *encourage* appeals from matters of discretion. Of course they do not. At the same time, this court and all courts will admit the perfect truth of what was said by Grier, J., delivering the opinion of this court in *Post* v. *Jones*:‡

" Where the law gives a party an appeal, he has a right to demand the conscientious judgment of the appellate court on every question arising in the cause."

But in the present case we come with an objection founded on the violation of a salutary principle of law.

*Mr. E. Casserly, for the respondents:*

I. *Is the Wrecking Company by the fact of its being incorporated, rendered incapable of being in law a salvor, and of receiving pay as such?*

We submit that it is not.

An enlightened public policy strongly demands that the

---

* 2 Curtis, 350; and see The Versailles, 1 Id. 360.

† The Westminster, 1 W. Robinson, 235.

‡ 19 Howard, 160.

means of salvage service should be the most efficient possible, and to that end should be always prepared, prompt, powerful, and reliable. Hence the court of admiralty has not hesitated to accept all beneficial modes and instruments of salvage service, which from time to time are developed by the progressive forces of society, even though it may depart from a settled rule of decision.

Thus the old rule, that none ·can claim salvage reward who did not directly take part in person in the salvage service has been so often broken down, that it is now an exception, rather than the rule. As where a ship sends part of her crew on salvage service, the crew who remain on board are entitled to share in the salvage earned.

A still stronger departure, made after considerable opposition, at least in the English admiralty,* was, when salvage was allowed to the owner of the ship engaged in the salvage service, though he may have been absent and ignorant of the transaction. The same equity is extended even to the owner of the cargo where he has authorized the service; and probably also where he has not.†

This departure, in favor of the owner of the vessel, was pushed still farther in the case of steamers. The greatly increased power and efficiency of these vessels, then a new. force in the maritime world, were cordially recognized and welcomed in admiralty, in the first case that arose there, and because it was the first.‡ This precedent has since been followed out and developed in numerous cases.§

Less than fifty years ago in admiralty, the claim of the salvor vessel was of but little worth, as compared with that of men salvors. Now keeping pace with the times, and their changed modes of salvage, the steamer is the real salvor, and has the lion's share of the reward. And the larger, stauncher and more powerful the steamer, the more liberal the reward;

---

* San Bernardo, 1 Robinson, 1,78.

† 2 Parson's Shipping and Admiralty, 278, and note 4. (Ed. 1869.)

‡ The Raikes, 1 Haggard, 246 (1824), per Lord Stowell.

§ The Beulah, 1 W. Robinson, 477; Kingaloch, 26 English Law & Equity, 599; The Island City, 1 Black, 130.

though the danger to such a vessel is reduced by her superior qualities to a minimum. The reason is, that society may be encouraged to give its best resources to the succor of life and property in distress at sea.

A leading consideration as to steamers is, that besides the value of the property which is generally at risk, they render salvage service with greater expedition, and often under circumstances where no other assistance could possibly avail.*

All the reasons for encouraging steamers, apply with equal force in favor of a powerful organization, such as the libellants.

So where the first set of salvors while prosecuting their operations are tortiously ousted by another set who complete the service; but the law ascribes to the first set the whole merit of the services of the second set, and awards to them the entire compensation.†

These are all cases in which salvage rewards are allowed as of course, to those who have had no personal part in the salvage service. They are all cases of a substituted service, in which persons removed from the field of operations may claim as salvors, on the strength of the actual service rendered by some person or property, which stands in their place, and is their substitute for the time being.

Should the powerful steamer of the libellants perform in the best manner a great salvage service, for which she had been at large cost expressly built and equipped, and at all times maintained in a state of the highest efficiency, could it be said, that because she was the property of a corporation, she must be denied a salvage compensation, or cut down to one which is no better than pay for work and labor?‡

If in the case of a salvage service by their steamer, the libellants here stand as favorably before the court as if they were natural persons, and not a corporation, why should

---

* The Kingaloch, 26 English Law & Equity, 599; Board of Trade Instructions to Receivers of Wrecks, &c., on Salvage, Art. 91, quoted in Maude & Pollock's Law of Merchant Shipping, 494, note q.

† See The Fleece, 3 W. Robinson, 280.

‡ The Perth, 3 Haggard, 416.

they not stand equally well in the case of services performed by their agents and servants? Either way, it is a case of substituted service, as sanctioned and rewarded in admiralty in numerous instances.

The well-considered decision on the circuit of the late Chief Justice in the case of *Virden* v. *The Caroline*,[*] asserts fully the doctrine of substituted service.

The corporation aggregate, which is but a mode of substituted service, is one of the great forces of civilization. It is the prevailing form of the associated energies, the money, enterprise, and intelligence of society. It is particularly adapted to those branches of business like salvage and wrecking, which require a permanent organization, costly appliances, trained services, and considerable capital, which is content with slow or uncertain returns.

For the carrying on of a salvage or wrecking business on a large and effective scale, there is really no comparison between the efforts of individuals casually employed for the occasion, often but poorly provided with vessels or other appliances, and under any circumstances unprepared for any long, remote, or costly enterprises, on the one hand, and on the other, a powerful company like the libellants, established expressly for the business; provided with capital, trained men, vessels, apparatus, machinery, a thorough organization, which enable it at any time to undertake and carry through the most arduous and protracted salvage services, in the face of great risks, anywhere on American waters, however remote, and at whatever expense.

Had the agents and servants sent out by the Coast Wrecking Company to save the monitor, conducted that important service as badly as they conducted it admirably, and thereby ruined or lost the cargo, the company would justly be made responsible before the law. Since it may be charged for the demerits of its servants, upon what principle is it denied credit for their meritorious services? If the company is capable in law of performing a salvage service at all, upon

[*] 6 American Law Register, 222, 227.

what principle can we distinguish against it, as compared with other salvors who are natural persons, in respect of the liabilities, which are the same undoubtedly, or of the rewards of the service?

The question to be now determined is, shall these powerful corporate organizations be recognized in admiralty on the same footing with individual salvors, and like them be rewarded according to the merit of the service performed? Or, shall they be put under a sort of outlawry, as unworthy of protection, and thus be hunted out of existence? They cannot exist if shut down to the pay of mere work and labor. Shall life and property on the navigable waters be deprived of their best reliance, and be cast back for succor on the old inefficient resource of casual help from individuals?

The fundamental public policy which is the supreme law of the subject, demands that every new efficient means or instrument of salvage service shall be recognized, accepted, and encouraged in admiralty. We offer here, what is proved to be the most efficient instrument yet produced by the forces of American society. Shall it be accepted or rejected?

II. *The objection that the owners of the property salved may have to pay the crew of the Wrecking Company.* Certainly they will not have to do so if the company is competent to act as a salvor. The company's men are well paid, and have made no such claim, nor is there any allegation of fear that they will. There is no tender of money in court, and because it is alleged that the owners *may* have to pay the crew, not one of whom asks to be paid by it, it will pay nobody.

Moreover, the objection is not made on the answer. It cannot be first made here.

III. *The service, in this case, was eminently a salvage service.* It presents, in a very high degree, all the ingredients of a salvage service, which are as follows: 1. The danger from which the property was rescued. 2. The value of the property. 3. The risk incurred in the salvage. 4. The value of the property employed in the service, and the risk to

it.  5. The skill and knowledge shown in rendering the services.  6. The time and labor expended.*

Indeed, that the service was a salvage service is everywhere, in substance, admitted by the answer.  The only issue really made, and this is made by implication, is as to the extent of the merit and the amount due.

If the service was thus a salvage service of vast merit, what force is there in the objection that the insurers agreed to pay for it?  They agreed only to do that which the law would have made them do without agreement; that which exists impliedly in every case of salvage.  For the compensation here was to be purely contingent.

Moreover, no such defence is taken in the answer.  And all that is said under the second head about want of tender applies equally here.

The only remaining question is,

IV. *As to the amount allowed.*  The law of salvage services to property in admiralty, as distinguished from the law of similar services on land, is founded on a great public policy, established in the general interests of the commerce and navigation of the country.  This public policy requires, for the protection of those interests, that such salvage services should be sedulously fostered; and, hence, that they should receive compensation, not as mere pay for work and labor, nor even as limited to the precise quantum of benefit in the particular case; but on a scale so liberal as best to encourage such services.†  With this principle borne in mind—and with it the further and perfectly settled one that appellate courts will not disturb the allowances made by inferior ones for salvage unless in cases of clear mistake, or gross overallowance—we need not discuss the matter largely.  The Aquila was a vessel of no value compared with the cargo.

* The Traveller, 3 Haggard, 371; The London Merchant, Ib. 395; The Fusilier, Browning & Lushington, 350; on appeal in Privy Council.

† The Blaireau, 2 Cranch, 266; Wm. Beckford, 3 Robinson, 355–6; The Sarah, Ib. 330; Rising Sun, Ware, 380.

Mr. Justice CLIFFORD delivered the opinion of the court.

Compensation, as salvage, is claimed by the libellants for services rendered by them in saving the cargo of the ship Aquila, which was wrecked in a storm, and sunk in the harbor of the port of San Francisco, to which she was bound, with all her cargo on board.

Such portion of the cargo as constitutes the basis of the investigation in this case consisted of certain materials manufactured for the construction of an iron-clad monitor, and the armament for the same, which was to be constructed at San Francisco by the claimants, under a contract with the government. They manufactured the materials and armament in New York, and the ship, with the same on board, sailed from that port on the twenty-ninth of May, 1863, and arrived and came to anchor in perfect safety, on the tenth of November following, off North Point dock, in the harbor of her port of destination, where she remained until the fourteenth of the same month.

Aided by a steamtug she attempted, on that day, to proceed to the wharf where she was to unload, but was obliged, by the state of the wind and tide, to come to anchor before she accomplished that object, and at midnight she encountered a heavy squall, which caused her to drag her anchors, and forced her into a more unfavorable position. Preparations were made on the following morning to get up to the wharf, and the wind having abated, the ship weighed anchor, and being again assisted by the steamtug, proceeded to the southern side of the wharf, where she was directed to discharge her cargo, and was there moored with her stem to the eastward and her stern towards the shore.

When she was moored the weather was good, but at ten o'clock in the evening the wind increased, and soon rose to a gale, from the southeast, which caused the ship to strike with such violence that she made a breach in her aft-port quarter to such an extent that in spite of any use which could be made of the pumps she filled with water, and at three o'clock on the following morning sunk in the dock, her stem lying in forty or fifty feet of water, and her stern

in twenty feet, and she lay with a list to the starboard at an angle of thirty-five or forty degrees.

Both the ship and the cargo belonged to the claimants, and they immediately abandoned the whole adventure to the underwriters, and the agent of the underwriters, though he declined to accept the offer of abandonment, commenced without delay to employ the best means in his power to raise the vessel and save the cargo, calling into requisition for that purpose all the nautical experience and mechanical skill at his command, but his efforts were fruitless, except that he succeeded in dismantling the ship, and in saving a small portion of the cargo.

. Apprised of the failure of the measures adopted by their agent to raise the ship and save the cargo, the underwriters at that juncture employed the libellants to undertake what their agent, with all the assistance he could command in the port of the disaster, was unable to accomplish.

Pursuant to their engagement, the libellants instructed their general agent to proceed to that port and take possession of the wreck, and they also dispatched with him a party of men, selected for the occasion and having experience as divers and wreckers, and provided them with the most approved machinery and apparatus to promote the success of the enterprise.

Chosen and qualified as described, the party, under the superintendence of the general agent of the corporation, sailed from the port of New York on the twenty-fourth of December, 1863, and took possession of the wreck, in the port of the disaster, on the twenty-third of January following. Although the undertaking was beset with difficulties and dangers on all sides, they made no objection on that account, but proceeded at once to the examination of the wreck, and the plan which they adopted and executed was to get out the cargo by divers, as far as was necessary to prevent it from being injured, and to lighten the ship, so that she could be raised and secured, and then to hoist out the remainder of the cargo by the apparatus and machinery prepared for the purpose.

They completed the work of securing the cargo, so far as it was necessary to lighten the ship, in less than three months, and when that was accomplished they were able to raise the ship, stopped the leaks, removed the mud (estimated at six hundred tons), pumped out the ship by means of steam pumps, and finally hoisted out the residue of the cargo and restored it to the owners in an undamaged condition, and the proofs show that the whole was accomplished with success in less than seven months from the time they were employed by the insurance companies.

Payment of their claim being refused, they filed their libel against that portion of the cargo which consisted of the materials for the construction of the iron-clad monitor, and the armament for the same, as set forth in the record, and the District Court entered a decree in their favor for the sum of $28,428.44 as compensation for the salvage services rendered by them in raising the ship and saving the cargo. Appeal was taken by the claimants to the Circuit Court, where the decree of the District Court was affirmed; whereupon the claimants appealed to this court.

Argument to show that the libellants were entitled to compensation for the services which they rendered is hardly necessary, as the proposition is several times impliedly admitted by the claimants in their answer. They were the owners of the ship as well as of the cargo, and they admit that she sunk near the wharf where she was to unload, at the time and by the means and substantially in the manner alleged in the libel, and they also admit that the efforts made by the agent of the underwriters to raise the ship and save the cargo were wholly unsuccessful, except as to a small portion of the cargo taken out while the men employed were engaged in dismantling the ship.

Implied admissions to the effect that important services were rendered by the libellants are contained in every article of the answer, but it is unnecessary to refer to those passages with more particularity, as the claimants expressly admit in the fourth article of the answer that the libellants secured

and saved all the cargo which was on board the ship when their general agent took possession of the wreck, and they also admit that the libellants raised the ship, but they deny that any of the services rendered were attended with much difficulty or danger, and they allege that the employees of the libellants, in accomplishing the work, unnecessarily damaged the ship, her tackle, apparel, and furniture, and insist that the salvage compensation to be allowed in the case ought to be greatly diminished on that account.

Apart from these disparaging allegations, the claimants do not set up in the answer any defence to the merits of the claim made by the libellants, except that they allege that the insurance companies have paid the libellants for all the services which they rendered as to thirteen-sixteenths of that part of the cargo described in the first article of the libel.

Most of the discussion at the bar has been addressed to topics other than those here enumerated, and much of it to questions not directly presented in the pleadings. Questions not raised by the pleadings, strictly speaking, are not before the court, but inasmuch as no objection on that ground was made by the libellants to any of the propositions submitted. by the claimants, they will all be considered in the order adopted at the argument. Briefly stated, they are as follows:

1. That the corporation libellants cannot maintain a salvage suit, because they are incapable as a corporation of rendering any personal services, and they insist that no party can be regarded as a salvor unless personally engaged in the service of saving the salved property.

2. That even if the corporation libellants may be regarded as salvors, still they were not the sole salvors in this case, and consequently that the decree rendered in the Circuit Court would not be a bar to a subsequent suit for the same services if instituted by their employees.

3. That the services rendered by the libellants were not salvage services, because they were rendered under and in pursuance of a contract with the underwriters.

4. That the amount allowed in the court below was exces-

sive, and that the decree in that respect violates the established principles of admiralty law regulating compensation for salvage.

I. Objection cannot be taken to the first proposition submitted by the claimants, that the question is not presented in the pleadings, as it necessarily arises upon the face of the record, and therefore if it is sustained, the decree must be reversed, as the compensation allowed is for salvage service, and not merely compensation *pro opere et labore*, as it should have been if the theory of the claimants is correct.

Decided cases are referred to in which it is said "that a party not actually occupied in effecting a salvage service is not entitled to a share in a salvage remuneration," but the learned judge who is represented as having expressed that opinion, admitted in the same case that the owners of vessels, who rarely navigate their own ships, constituted an exception to that general rule.* Similar remarks were also made in the case of *The Charlotte*,† and it is supposed by the claimants that the case of *The Lively*‡ is an authority to the same effect; but the question whether the owners of a vessel, when not personally engaged in a salvage service, were entitled to a salvage compensation for assistance rendered in the case by their vessel was not in any way involved in that record.

Examples where the suit for salvage was promoted by the owners of the salving vessel are quite numerous, in cases where the decisions were made before our judicial system was organized; and it was expressly determined in the case of *The Haidee*,§ that owners were by no means unfit persons to originate suits to recover compensation for salvage services. Strong doubts are entertained whether the court, in any of the cases before referred to, intended to decide otherwise, but the inquiry is of no importance, as all of the modern decisions in that country affirm the right and support it by reasons both satisfactory and conclusive.‖

---

* The Vine, 2 Haggard, 2; The Mulgrave, Ib. 79.
† 3 W. Robinson, 73.    ‡ Ib. 64.
§ 1 Notes of Cases, 598.
‖ The Waterloo, 2 Dodson, 443.

When steamers render salvage service the court held, in the case of *The Kingalock*,* that they are entitled to a greater award than any other set of salvors rendering the same service, because they can perform such services, owing to the power they possess, with much greater celerity than other vessels, and with much greater safety to the vessel in danger, and frequently under circumstances in which no other assistance could be effectual. Consequently the court having cognizance of such cases looks with favor on the exertions of steamers in assisting vessels in peril, as they can render such assistance with greater promptitude and with much more effect than vessels propelled in any other way.†

Reported cases where the suits for salvage were promoted by the owners of steam vessels, and in many cases by the owners of steamers built for the special purpose of rendering such services, and devoted exclusively to that particular employment, are very numerous in the reports of decisions in admiralty published within the last twenty years. Indeed they have been multiplied to such an extent within that period that it would be a useless task to attempt to do more than to refer to one or two of a class as examples to illustrate the course of modern decisions upon the subject, but it may not be out of place to remark that many others to the same effect will be found in the very volumes from which the citations here made have been selected.

Take, for example, the case of *The Albion*,‡ in which the sum of £350 was awarded to the owners. *The Saratoga*,§ in which the sum of £600 was awarded, and it was wholly given to the steamtug. *The True Blue*,|| in which the suit was promoted by the owners, master, and crew of a steamship, and the sum of £500 was awarded to the libellants.

Some discussion took place at the bar, in the case of *The Abercrombie*,¶ as to the relative claims of the owners of ships,

---

* 1 Spinks, 267.

† The Alfen, Swabey, 190; The Mary Anne, 9 Irish Jurist, N. S. 60; The Raikes, 1 Haggard, 246; The Merchant, 3 Id. 401; The Perth, Ib. 416.

‡ 1 Lushington, 282.                          § 1 Ib. 318.

|| 4 Moore, Privy Council, N. S. 96.          ¶ Ib. 380.

and of the masters and crews of the same, but the court said that the discussion was unnecessary, because the rights of such parties were so constantly under consideration that the principles regulating the distribution of salvage in such cases were so well understood, that the only difficulty that ever arises is in ascertaining the facts so as to be able to apply the principles to the particular case.

Services were rendered to a sailing vessel in the case of *The White Star*,* and suitable remuneration for the services having been refused, the owners, master, and crew, instituted a salvage suit against the salved vessel and her cargo, whereupon the owners of the salved property appeared and pleaded that the services had been rendered under an agreement, but it appearing that the undertaking was attended with greater difficulty and danger than the parties supposed at the time the agreement was made, the court held that the libellants were entitled to recover a certain sum beyond that tendered under the agreement.

So where salvage compensation was claimed by the master, owners, and crews of six luggers, a cutter, and a lifeboat, the court sustained the libel and awarded a sum equal to one-third of the salved property, including the ship as well as the cargo.†

Proceedings in salvage were instituted in the case of *The Canova*,‡ by the owners and crew of a steamtug, for services rendered in towing the vessel from a place of danger to her dock in her port of destination, but it appearing that there was an agreement *to do the work for an agreed price*, the court declined to allow any salvage compensation.

Modern text-writers, without an exception, uphold the right of the owners of ships and vessels, whether propelled by steam or otherwise, to claim salvage compensation when such services are rendered by their vessels, whether they are present or absent at the time the service is performed; and the author of the latest work published upon the subject states that one-tenth of all the salvage awards collated in

---

\* Law Reports, 1 Adm. and Eccl. 71. † Ib. 50. ‡ Ib. 54.

the Digest of the Decisions in Admiralty by the English courts are to owners and vessels, boats, tugs, and steamers. Assuming his estimate to be correct, it appears that thirty-five cases collated in that work recognize owners as salvors, and twenty-five the vessels themselves as entitled to such compensation.*

Owners of the salving vessel, says MacLachlan, are entitled to remuneration, in the nature of salvage, in addition to expenses, when they show actual loss suffered, or risk in respect to their property encountered in the service, but charterers are not in the same position unless there is a stipulation giving them the control and benefit of the salvage, or unless the vessel is chartered and sailed on their responsibility.†

Under ordinary circumstances the owners of the ship which rendered the service are allowed one-third of the amount awarded as salvage compensation, but they are sometimes allowed much more where the salvage service was of a character to expose the ship to peculiar danger, especially if she was a steamer of large size and of great value.‡

Suppose it be conceded that the owners of a vessel may promote a suit for salvage and that they may be entitled to a salvage compensation, still the claimants insist that the libel in this case does not come within the operation of that rule of pleading, as the libellants are a corporation, but they assign no reasons in support of the proposition, which, if adopted and held to be sound, would not also require the court to hold that the owners of vessels are not entitled to salvage compensation, and are not competent to promote a salvage suit, which cannot be admitted.

---

* Roberts's Adm. 103; 2 Pritch. Dig. 727 to 909; 2 Parsons on Shipping, 277, 278; The Blaireau, 2 Cranch, 269; The Embank, 1 Sumner, 426.

† MacLachlan on Shipping, 529; Maude & Pollock on Shipping, 423; Abbott on Shipping, 571.

‡ 2 Parsons on Shipping, 299; The Waterloo, Blackford & Howland, 114; The Rising Sun, Ware, 385; The Beulah, 1 W. Robinson, 477; The Martin Luther, Swabey, 287; The Enchantress, 1 Lushington Admiralty, 96; The Splendid, 2 Mar. Law Cases, 216; The N. Hooper, 3 Sumner, 578.

Corporations, it is said, are not entitled to salvage remuneration, because no party, as the argument is, can be so entitled except such as actually engages in rendering the salvage service; but if that is the reason for denying such compensation to corporations, then it is clear that the owners of vessels must also be excluded from participating in any such reward, as they seldom or never navigate their own ships.*

Remuneration for salvage service is awarded to the owners of vessels, not because they are present, or supposed to be present when the service is rendered, but on account of the danger to which the service exposes their property and the risk which they run of loss in suffering their vessels to engage in such perilous undertakings; and if that is the legal foundation of their claim it is difficult to perceive any reason why the same rule should not be applied to corporations as the owners of ships and vessels similarly employed and exposed.

No satisfactory reason for such a discrimination can be given, because it is believed that the two cases are precisely analogous.  But the question is hardly an open one in this court, as will appear by an attentive examination of the case of *The Island City*, which was elaborately argued by able counsel, and very carefully considered by the court.

Three libels were filed against the bark in that case in the District Court, but the district judge being concerned in interest, the three records were removed into the Circuit Court.  By the original record it appears that one of the libels was filed by the owners of the steamer Western Port; another in behalf of the steamtug R. B. Forbes, which was owned by an incorporated company, and the third by persons on board the schooner Kensington.

Sole salvage was claimed by the owners of the Western Port, and they denied that anything should be awarded to the steamtug, but the circuit judge held otherwise; and having determined that the property saved ought justly to

---

* The Bark Edwin, 1 Clifford, 326.

pay the sum of $13,000 to all concerned, awarded $5200 of that amount to the owners of the steamtug.*

Dissatisfied with the decree of distribution, the owners of the Western Port appealed to this court. Even a slight examination of the decree in the case will show that the appeal involved the whole question under consideration, but this court affirmed the decree of the Circuit Court, which in effect established the rule that the owners of ships, whether individuals or corporations, may promote a salvage suit, and are entitled, in a proper case, to salvage remuneration.†

Prior to that time the same point had been decided by the late chief justice and two of the associate justices of this court as then constituted.‡

Certain unreported decisions of the district judges are referred to where a contrary doctrine is held; but they appear to overlook the fact that vessels disabled, or otherwise in need of assistance from the shore, depend, everywhere at this time on our coast, almost entirely upon steamtugs, constructed and equipped for the purpose, and whose business it is to be always ready and at command whenever assistance is required. Such steamers are generally owned by incorporated companies, and having been built and equipped for the purpose, and being manned with officers and seamen having the requisite experience and skill, the interests of commerce cannot safely dispense with their services.§

Considerations of the character suggested seem also to have induced the admiralty courts of England to adopt principles of adjudication and rules of practice consistent with the employment of these comparatively new and effective instruments of relief in cases of disasters upon the seas. Reference is made to a few cases as establishing that proposition, and to show that the course of decision in the two

---

* The Island City, 1 Clifford, 210, 219, and 221.

† The Island City, 1 Black, 121.

‡ The Caroline, 6 American Law Register, 222; The Independence, 2 Curtis, 351; The William Penn, 1 American Law Register, 584.

§ The Perth, 3 Haggard, 416.

countries is entirely coincident in every particular involved in this record.*

Claim in that case was made for a salvage compensation, and the suit was instituted by the Liverpool Steamtug Company. Assistance in the case of *The Paul*† was rendered to a ship and her cargo, and the salvage suit was commenced and prosecuted by the Anglo-Egyptian Steam Navigation Company. Libellants in the case of *The Collier*‡ were the Brighton Railway Company as owners of the steamship Lyons, and the master and crew, and the libel was sustained.§

II. Next proposition of the claimants is that the libellants, even if they may be regarded as salvors, were not the sole salvors, and consequently that the decree of the Circuit Court ought not to be affirmed, as it would not be a bar to a subsequent suit for the same services if instituted by their employees.

Evidently the objection is in the nature of a plea in abatement, and should have been taken in the answer, or by a proper exception in the court below. Monition, in due form, was issued at the commencement of the proceedings, which was a notice to every one interested to appear and show cause, if any, why the prayer of the libel should not be granted.

Adjudged cases, besides those already cited, are quite numerous, where salvage suits have been instituted in the name of the ship or of the owners, without any allegation that the suit was prosecuted for the benefit of the master and crew, and no case is referred to where it has been held that the claimants, even in the court of original jurisdiction, can abate the suit on that account. All persons interested may appear, on the return of the monition, and become parties to the suit, or, by some proper proceeding, have their rights

---

* The Pericles, 1 Browning & Lushington, 80.

† Law Reports, 1 Adm. and Eccl. 57.                ‡ Ib. 83.

§ The Minnehaha, 1 Lushington, 335; The Annapolis, Ib. 355; The Pensacola, 1 Browning & Lushington, 306; The Fusilier, 1 Ib. 341, 349; The Bartley, Swabey, 198; The Galatea, Ib. 349.

adjudicated; and in many cases, even after the decree upon the merits is pronounced, they may appear at any time before the fund is distributed and claim any interest they may have in the proceeds of the property libelled, if any, in the registry of the court, but it is quite clear that the claimants in this record are in no condition to present for decision any such question as that involved in the proposition under consideration.

III. If the defence is not sustained on that ground, then the claimants contend that the services rendered were not salvage services, because, as they allege, they were rendered under an agreement for a fixed sum.

Three answers may be given to that proposition, each of which is sufficient to show that it cannot be sustained. (1.) No such defence is set up in the answer. (2.) Nothing was ever paid or tendered to the libellants for that part of their claim now in controversy, and it is well settled law that an agreement of the kind suggested is no defence to a meritorious claim for salvage, unless it is set up in the answer with an averment of tender or payment. Such an agreement does not alter the character of the service rendered, so that if it was in fact a salvage service, it is none the less so because the compensation to be received is regulated by the terms of an agreement between the master of the ship or the owners of the salved property.*

Defences in salvage suits, as well as in other suits in admiralty, must be set up in the answer, and if not, and the services proved were salvage services, the libellants must prevail.† Agreements of the kind suggested ought certainly to be set up in the answer, as it is not every agreement which will have the effect to diminish a claim for salvage compensation. On the contrary, the rule is that nothing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious claim for salvage.‡

---

* The Emulous, 1 Sumner, 210.    † The Boston, Ib. 328.
‡ The Versailles, 1 Curtis, 355; The Lushington, 7 Notes of Cases, 361;

(3.) But if the agreement had been set up in the answer, it would constitute no defence, as by the terms of the instrument the libellants were not to receive any compensation whatever, or be entitled to any lien upon the property, unless the materials and machinery were substantially saved, so that it is clear that the compensation was not to be paid at all events.

IV. Discussion as to the amount allowed in the decree is hardly necessary, as it is clear that it does not much exceed the amount the claimants agreed to pay for the services, in case the libellants were successful in raising the ship and in saving the materials intended for the construction of the monitor and her armament.

Attempt was made by the agent of the underwriters, at great expense, to pump out the ship, as before explained, but the record shows that he was unsuccessful, although the men engaged in the attempt were under the superintendence of one of the claimants. Expensive preparations became necessary before they could commence pumping, and in the course of those arrangements they were obliged to cut openings in the decks and through those openings they took out sixty or seventy tons of the cargo, but the attempt to pump out the ship proved an utter failure, from the intrinsic impracticability of raising the vessel by that plan.

Next attempt by that party was to lift the vessel, with the cargo on board, by means of chains, but the scheme as projected proved to be impracticable, as the bottom of the dock where the ship sunk was solid rock, and the divers found it impossible to get the chains under the vessel. Efforts of a similar character were continued by the agent of the underwriters until he expended $38,000 in gold, but all his efforts to raise the ship or save the cargo, except the fractional part before mentioned, were wholly unsuccessful.

---

The Centurion, Ware, 477; The Foster, Abbott, Admiralty, 222; The Whitaker, 1 Sprague, 283; The Brig Susan, Ib. 503; Parsons on Shipping, 275; The Phantom, Law Reports, 1 Adm. and Eccl. 61; The White Star, Ib. 70; The Saratoga, 1 Lushington, 321; MacLachlan on Shipping, 531; The John Shaw, 1 Clifford, 236.

Complete success attended the efforts of the libellants, as is admitted by the claimants in their answer.

When the property in question was insured, it was valued at $400,000, for which policies were granted by the underwriters for the sum of $340,000; and under the contract between the claimants and the libellants they adopted the same valuation. Of that sum $60,000 was uninsured, and $15,000 of the amount insured was never paid, and the record shows that the whole of the property on board when the agent of the libellants took possession of the wreck was rescued from imminent peril and was delivered to the claimants or their order.

Difficulties almost unexampled attended the undertaking, and the divers, in taking out the cargo to lighten the ship so that she could be raised and secured, were exposed to great danger. Expenses were incurred by the libellants exceeding $60,000 in rescuing and saving the property, including moneys paid out and loss of apparatus and machinery. Considering the skill required to perform the work, and the expense incurred, and the time and labor spent in completing the enterprise, the court is not satisfied that the amount awarded is excessive.

Appellate courts are reluctant to disturb an award for salvage, on the ground that the subordinate court gave too large a sum to the salvors, unless they are clearly satisfied that the court below made an exorbitant estimate of their services.*

Judge Story said, in the case of *Hobart* v. *Drogan*, † that the " court is not in the habit of reversing such decrees as to the amount of salvage, unless upon some clear and palpable mistake or gross over-allowance of the court below.‡

Evidence to show any such errors in the case is entirely

---

* The Fusilier, 1 Browning & Lushington, 850; Hobart *v.* Drogan, 10 Peters, 119.

† 10 Peters, 119.

‡ The True Blue, 4 Moore Privy Council, N. S. 101; The Emulous, 1 Sumner, 214.

wanting, and in view of the whole record the court is of the opinion that the decree of the Circuit Court is correct.

DECREE AFFIRMED WITH COSTS.