UNITED STATES, on Behalf of the LORD COMMISSIONERS, etc., et al. v. The JAMES L. RICHARDS.
No. 4428.

United States Court of Appeals
First Circuit.
Jan. 19, 1950.

Thomas F. McGovern, Attorney, Department of Justice, Washington, D. C. (H. G. Morison, Assistant Attorney General, George F. Garrity, United States Attorney, Boston, Mass., and J. Frank Staley, Attorney, Department of Justice, Washington, D. C., on brief), for appellants.

Seymour P. Edgerton, Boston, Mass. (Bingham, Dana & Gould, Boston, Mass., on the brief), for appellee.

Before MAGRUDER, Chief Judge, WOODBURY, Circuit Judge, and CLIFFORD, District Judge.

WOODBURY, Circuit Judge.

This is an appeal from an order dismissing as untimely brought a libel in admiralty for salvage instituted by the United States on behalf of the Lord High Admiral of Great Britain and Northern Ireland, acting on behalf of His Britannic Majesty as owner of His Majesty's Rescue Tug "Busy", and also on behalf of that vessel's officers and men, against the steam-ship "James L. Richards", her engines, boilers, etc.; the Massachusetts Trustees of Eastern Gas and Fuel Associates, claimants.

The facts are not in dispute and can be simply stated.

During the early morning hours of August 28, 1943, the steamship "James L. Richards", while under requisition time charter to the United States, ran aground off the mouths of the Orinoco River in the course of a voyage from Georgetown, British Guiana, to Port-of-Spain, Trinidad, with a cargo of bauxite. After futile attempts to extricate herself under her own power she broke radio silence to report her position and request assistance from the United States Naval Control Officer at Port-of-Spain, Trinidad. That officer thereupon dispatched His Majesty's Rescue Tug "Busy", then stationed at Port-of-Spain and standing by for the purpose of giving aid to allied vessels in distress, to assist the "Richards." The "Busy" arrived in due course, and at high water on the afternoon of August 30, by towing, helped the "Richards" to free herself from the mud bank on which she had struck. Both vessels then proceeded to Port-of-Spain, and the "Richards", after stopping only long enough to make sure that no serious damage had resulted from the stranding, continued on her voyage to the North American coast, along which she traded from that time on until the instant libel against her was filed by the United States in the court below on April 12, 1946, some two years and eight months after the salvage services were rendered.

There is no question presented of the standing of the United States to bring this libel under its agreement with the United Kingdom of December 4, 1942, and the exchange of notes incidental thereto. 56 Stat. Part 2, 1780–1783. The only question raised is whether the libel was seasonably brought.

The appellees, as claimants of the "Richards", took the position in the court below, and that court agreed with them, that the Government's libel for salvage was barred by § 4 of the Salvage Act of August 1, 1912, 37 Stat. 242, 46 U.S.C.A. § 730, which

provides: "That a suit for the recovery of remuneration for rendering assistance or salvage services shall not be maintainable if brought later than two years from the date when such assistance or salvage was rendered, unless the court in which the suit is brought shall be satisfied that during such period there had not been any reasonable opportunity of arresting the assisted or salved vessel within the jurisdiction of the court or within the territorial waters of the country in which the libelant resides or has his principal place of business."

The United States, on the other hand, contended below, and as appellant contends here, that the above Act has no application whatever because its § 5 provides: "That nothing in this Act shall be construed as applying to ships of war or to Government ships appropriated exclusively to a public service." 46 U.S.C.A. § 731. Moreover, it contends that even though the above Act should apply, the two year limitation which is imposed upon the bringing of suits for salvage by § 4, quoted above, does not bar the instant libel because of the impossibility at any time during that two year period of arresting the salved vessel in the home waters of the salvor, which, it says, operates to intermit and toll the limitation period.

Certainly H.M.R.T. "Busy", although perhaps not strictly speaking a ship of war, was a government ship "appropriated exclusively to a public service." Nevertheless, the court below held that § 5 of the Act of August 1, 1912, supra, was "inapposite", in that it precluded application of the Act, and of the Brussels Assistance and Salvage Convention of Sept. 23, 1910, ratified by the United States on March 14, 1912, 37 Stat. Part 2, 1658, which it was passed to implement, when the salved vessel was a ship of war or government ship appropriated exclusively to a public service, but did not preclude its application when claims were made for services rendered by a government ship to a private vessel like the "Richards".

At first glance it might appear that the provision of § 5 of the Act, supra, to the effect that nothing therein should be construed as applying to ships of war, or to government ships appropriated exclusively to a public service, prevented any application of the time limitation imposed upon the bringing of suits for salvage in its § 4, to any case in which either the rescuing or the rescued vessel was a naval or government ship. But it is to be observed that § 5 prevents application of the Act to ships of certain described kinds, not to governments, or to public officers or servants, and the only ships involved as legal entities in cases of marine salvage are the vessels salved.[1] Despite a dictum pointing to the contrary in The Comanche, 8 Wall. 448, 473, 19 L.Ed. 397, so far as we have been able to determine libels in admiralty for salvage have never been brought in this country by the rescuing vessel as a juristic person, nor has salvage ever been awarded to such a vessel as an entity. Here salvage suits are apparently always brought by, and salvage awarded to, the owner of the vessel making the rescue to compensate him for any monetary loss he may have suffered as a result thereof, and to reward him for such risks as his property may have incurred in the venture, and by the officers and crew of the rescuing vessel, either themselves or by the owner of their vessel on their behalf, to compensate them for their exertions and to reward them for their personal risk.[2] The Comanche, 8 Wall. 448, 470–476, 19 L.Ed. 397; The Blackwall, 10 Wall. 1, 10–13, 19 L.Ed. 870. And this practice accords with the definition of salvage in The Clarita and The Clara, 23 Wall. 1, 16, 23 L.Ed. 146, 150 in which it is said that "Salvage is well defined as the compensation allowed *to*

---

1. Suits for salvage may be either *in rem* against the property salved, or *in personam* against any party liable for the salvage service, or against both. Rule 18 of the Admiralty Rules of the Supreme Court of the United States, 28 U.S.C.A.

2. This is not to say that in appropriate cases salvage may not also be awarded to persons other than the owner, officers, and crew of a rescuing vessel. See The Blackwall, 10 Wall. 1, 19 L.Ed. 870.

*persons* (emphasis supplied) by whose assistance a ship or vessel, or the cargo of the same, or the lives of the persons belonging to the ship or vessel, are saved from danger or loss in cases of shipwreck, derelict, capture, or other marine misadventures." Moreover the practice also accords with the policy underlying the award of salvage which is given not merely to compensate on a *quantum meruit* basis the persons by whose voluntary assistance property is saved from peril or loss in navigable waters, but also to reward such persons by giving them a sort of bonus or bounty for their perilous services voluntarily rendered to the end that seamen and others may be induced to exert themselves to save life and property in peril on the sea. The Blackwall, supra, 10 Wall. 1, 14, 19 L.Ed. 870; 1 Benedict on Admiralty, 6th Ed., § 117. In short, salvage is not merely compensation, but it is also a reward, given to persons for their meritorious services in order to encourage others to do likewise, and hence the right to it seems always to have been considered as inuring to a person participating in some way either directly or indirectly in a rescue, rather than to a thing, such as a ship, used in rescue operations. Of course, if salvage were awarded to a rescuing vessel itself, the award would eventually be distributed to and between its owner and crew, but nevertheless, apparently, the thinking in admiralty with respect to vessels as legal entities has never in this country gone so far as to recognize the rescuing vessel as a salvor, or salvaging entity, capable of bringing suit separate and apart from its owner and crew.

■ Furthermore, the treaty, the Assistance and Salvage Convention supra, which the Act was designed to implement, provides in its Article 14 that "This convention does not apply to ships of war or to Government ships appropriated exclusively to a public service", and then in Article 15, the Convention provides that "The provisions of this convention shall be applied as regards all persons interested when either the assisting or salving vessel or the vessel assisted or salved belongs to one of the contracting States, and in any other cases for which the national laws provide." Thus, construing Articles 14 and 15 together, it would seem that the Convention was not meant to apply to Government ships as legal entities, but was meant to apply "as regards all persons interested" when Government ships are involved in salvage operations who, when a Government ship is the rescuer, are typically its owner and personnel. This by strong inference supports our conclusion that § 5 of the Act, the language of which closely parallels the language of Article 14 of the Convention, was intended to exclude only Government ships as legal entities from the application of the Act in the same way that Article 14 excluded only such ships from the application of the Convention.

■ We come to the conclusion, therefore, that the language of § 5 of the Salvage Act of 1912, supra, was carefully chosen to avoid the imposition of liability for salvage upon Governments through suits against their ships, leaving the matter of governmental liability for salvage to national legislation, as to the United States see Suits in Admiralty Act of March 9, 1920, 41 Stat. 525, 46 U.S.C.A. §§ 741, 742; Public Vessels Act of March 3, 1925, 43 Stat. 1112, 46 U.S.C.A. § 781; 1 Benedict on Admiralty, 6th Ed., § 126, but at the same time to impose the same limitations and restrictions upon Governments with respect to their suits for salvage, should they at any time see fit to assert a claim therefor, as upon private suitors. Hence, as we see it, the Act is applicable here, for the salved ship, the "Richards", does not belong in the category of ships to which the Act is inapplicable, but is a private vessel.

■ The question next to arise is whether the time limitation imposed upon the bringing of suits for salvage in § 4 of the Act bars the instant libel. We agree with the District Court that it does.

Section 4 of the Act quoted above interdicts suits for salvage brought like the instant one more than two years after the rendition of the salvage service, unless the

court in which the libel was brought is satisfied that during that two year interval there had been no reasonable opportunity of arresting the salved vessel within its jurisdiction, or within the territorial waters of the country of the libelant's residence or principal place of business. Clearly the "Richards" was never within British territorial waters during the two years following her rescue by the "Busy". She was plying the Atlantic coast of the United States during that entire time. But, equally clearly, in the course of that two year period, she was not only many times within the jurisdiction of some district court of the United States, but on the undisputed evidence she was within the jurisdiction of the particular United States District Court in which the instant libel was filed no less than fifty-two times. Therefore there certainly was a reasonable opportunity to arrest her, not only within the jurisdiction of some United States District Court, but within the jurisdiction of the specific United States District Court in which this libel was brought, within the two year limitation period, so that the · libel is barred unless, as the Government contends, that period is extended because during it there was no opportunity to arrest the "Richards" in the home waters of the salvors.

We cannot adopt this contention of the Government. The section of the statute under consideration is phrased in the disjunctive, and read as it is phrased it makes abundant sense. Under these circumstances we are not disposed, if we are at liberty, to rephrase it in the conjunctive as the Government would like to have us do. As the section reads a salvor is not required to pursue the salved vessel around the world. He may if he chooses await her arrival in his own country as long as he likes. But if he does not wish to wait, or fears that the vessel will never come to him, he may pursue his remedy in the court of some other country where he can arrest the salved vessel. In this event, however, his action must be timely in the court of his resort. This amply protects a salvor's rights, and furthermore it effectuates the section's policy of repose in that it gives the owner of the salved vessel an opportunity, by appropriately routing his ship, to close its books after two years, and avoid stale claims, which he might never be able to do, as the District Court pointed out, if the Government's contention should prevail.

The order of the District Court is affirmed.