ADOLPHE, The, (WILLIAMS v.)

[See Williams v. The Adolphe, Case No. 17,-712.]

---

## Case No. 87.

### The A. D. PATCHIN.

[1 Blatchf. 414.][1]

Circuit Court, N. D. New York. Oct., 1849.

SALVAGE—UNDER CONTRACT—NONJOINDER OF ALL OF THE SALVORS.

1. Where a vessel was stranded, and salvage services were rendered by another vessel in relieving her, in pursuance of a written contract between the owner of the latter and the agent of the master of the former, which stipulated the per diem compensation for the services: *Held*, that the district court had jurisdiction of a libel in rem for the salvage services, notwithstanding the written agreement.

[Cited in The Circassian, Case No. 2.723; The Silver Spray's Boilers. Id., 12.857; The Williams, Id. 17.710; Pope v. The Sapphire, Id. 11.276. Followed in The Louisa Jane, Id. 8,532.]

[See note at end of case.]

2. The contract was not necessarily binding upon the vessel in peril. or upon her owner, and it would be the duty of the court to disregard it, and to award compensation according to the principles of admiralty in salvage cases, if any advantage was taken by the libellant in the agreement.

[Cited in The Independence, Case No. 7.014; Bowley v. Goddard, Id. 1,736; The J. G. Paint, Id. 7.318; Harley v. Railroad Iron, Id. 6,068; The Williams, Id. 17,710; Chap-

man v. The Greenpoint. 38 Fed. Rep. 672; The G. W. Jones, 48 Fed. Rep. 926.]

[See note at end of case.]

3. The rate fixed by the contract is looked at in determining the amount proper to be awarded for the salvage services, and would be disregarded if disproportionate or unreasonable, or if extorted through the pressure of impending calamity.

[Cited in Bowley v. Goddard. Case No. 1,736; The J. G. Paint. Id. 7,318; Chapman v. The Greenpoint, 38 Fed Rep. 672; The G. W. Jones, 48 Fed. Rep. 926; Brooks v. The Adirondack, 2 Fed. Rep. 393.]

[See note at end of case.]

4. The admiralty jurisdiction, in salvage cases. is as essential to the protection of the vessel subject to salvage. as it is to the indemnity of the salvor, and can scarcely be ousted by any agreement for rendering the services.

[See Williams v. The Jenny Lind, Case No. 17,723.]

5. Although all the suitors for salvage ought to join in the suit against the property saved, yet the non-joinder of the crew of the salvor vessel, in a suit by the master and owner, is no objection to the maintenance of the suit, in a case where the crew were exposed to no extraordinary hardships or personal danger.

In admiralty. A libel in rem was filed, in the district court, by Charles L. Gager, owner and master of the steamboat Albany, against the steamboat A. D. Patchin, to recover for salvage services rendered to that vessel by the Albany, under the following circumstances. The Patchin was aground upon a ledge of rocks at Racine Point, Wisconsin, and a contract in writing was entered into between the libellant in person and one Higby, who professed to act as agent for one Harry Whittaker, the master and sole owner of the Patchin. The contract was as follows: "This article of agreement made this 13th day of June. 1848, between the steamer Albany, and the steamer Patchin, Capt. H. Whittaker. in which Capt. Gager of the steamer Albany agrees to do all he can do to assist said Patchin, now on the rocks at Racine Point. Wisconsin, and to stay with her until discharged by said Capt. Whittaker, and said Albany is to be paid four hundred and fifty dollars per day, and time to commence four o'clock to-day. Said Albany to have the privilege to make harbor in case of storm. Milwaukee, June 13, 1848. H. Whittaker, per L. J. Higby, Agent." The agreement was made at Milwaukee, a few miles from where the Patchin lay, and was assented to by the claimant, on its being soon afterwards made known to him. He resided in Buffalo, N. Y. It did not appear that the libellant had any knowledge, at the time the contract was made, that Whittaker had any interest in the Patchin as owner. The Patchin was in no danger of immediate destruction when the contract was made; the weather was fair and calm; a large number of persons were already engaged in endeavoring to get her off the rocks; steamers were frequently passing near to the spot where she lay; the terms of the agreement were deliberately

[1][Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

settled; and, in order to determine the just measure of compensation, the books of the Albany were resorted to for the purpose of ascertaining her ordinary earnings, and the amount to be paid was fixed accordingly. The vessels were both of them of large value. The Albany transferred her passengers, of which she had a large number on board when the contract was made, to another steamer, and refunded to them their passage money. She was then constantly employed during four successive days and nights in rendering assistance to the Patchin, not altogether without danger to herself from hidden rocks, and, during a portion of the time, in strenuous efforts, subjecting her to heavy strains, to jerk or drag the Patchin from the rocks. The crew of the Albany were engaged in assisting the Patchin, but did not join as libellants in the suit. The decree of the district court was in favor of the libellants.

The opinion of CONKLING, District Judge, was as follows:

"One of the objections urged against the libellant's right to maintain this action is, that the services for which he claims compensation, having been performed in pursuance of an express agreement between the parties, and for a stipulated compensation, this is not a case of salvage, but a case of contract of which the court has no jurisdiction. In support of this objection, the counsel for the claimant relies upon a similar case of The Mulgrave, 2 Hagg. [Adm.] 77, in which Lord Stowell pronounced against the action on this ground, observing that it was not a case of salvage but one of contract, and that he could not entertain the question. Lord Stowell did not, of course, intend to say that he could entertain no action arising ex contractu, but only, that the case before him not being a case of salvage, he could not entertain it as a case of that character, and not being a case falling within either of the descriptions of contracts embraced within the jurisdiction of the court, he could not entertain it as such. It is well known that the only contracts upon which, at the date of this decision, original suits were in fact entertained in the English high court of admiralty were those for seamen's wages and bottomry bonds, although it has always been conceded that the jurisdiction of the court extended to all such contracts as were made on the high seas and were to be there executed. But, by a long series of American decisions, terminating with that of New-Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 344, the principle is now firmly established, that the jurisdiction of the American courts of admiralty does not depend on the decisions of the English common law courts relative to the jurisdiction of the high court of admiralty in England, but that all contracts in their nature strictly maritime, are cognizable in the admiralty. Such, certainly, is the character of this contract; and if the suit had been in personam, the jurisdiction of the court would have been unquestionable.

"But, whether the contract created a lien on the Patchin, and may, therefore, also be enforced in a suit in rem, is another question not devoid of difficulty. That a suit in the admiralty for salvage may be maintained in either form, has never been doubted, and this right is, moreover, expressly recognized and declared by one of the late rules prescribed by the supreme court. Rule 19, Conk. Adm. 790. If, therefore, the salvor's title to remuneration in ordinary cases may be considered as founded in implied contract, it might with great apparent force and propriety be insisted, that the remedial right of the salvor could not in any degree be impaired by an express contract entered into beforehand for the mere purpose of fixing the amount of compensation, without any express or clearly implied intention of waving the right to prosecute in either of the accustomed forms. But, suits for salvage have generally been considered—though I confess it has always appeared to me with somewhat questionable propriety—as cases rather of tort than of contract. It would not necessarily follow, therefore, because the maritime law gives a lien in favor of the salvor in a case strictly of salvage, that it also confers one for services of the like nature rendered in pursuance of a contract. But it is a general principle of the maritime law, that from contracts made by the master which bind the owner, as all authorized contracts entered into by him on account of his ship do, unless otherwise expressly provided, there results an implied hypothecation of the ship. The master, undoubtedly, has authority to hire the services of others, when necessary for the preservation of his vessel, and I imagine that such a contract, subject to the revisory power of the court, would constitute a lien on the vessel.

"It happens, however, in the present instance, that the master was also the sole owner of the vessel to which assistance was rendered; and it is insisted that on this account he incurred no other than a personal responsibility. Admitting the general principle thus asserted it becomes necessary, nevertheless, to inquire whether the present is a case to which it is properly applicable. The contract was originally entered into between the libellant in person and Lewis J. Higby, professing to act as agent for the claimant. It was made at the place where it bears date, a few miles from the place where the Patchin lay, and, on being soon afterwards made known to the claimant, was assented to by him. His residence was in Buffalo, in the state of New-York. The claimant, it will be observed, is described simply as the captain of the Patchin, and there is no allegation in the pleadings, nor any evidence, that the libellant had any knowledge of his proprietary interest in the

vessel. In the case of The St. Jago de Cuba, 9 Wheat. [22 U. S.] 409, it was held that although, for materials or supplies furnished in a home port, no implied lien in general attaches to the ship, the reasonable presumption being that they were furnished on the credit of the owner, yet if a vessel comes into her home port in a foreign guise, and obtains supplies, this principle is applicable to the case, and a lien in favor of material men arises. 'The question,' says the court, 'then arises, on what does the privilege of material men depend? On the state of facts, or on their belief of facts?' The answer given by the court is, that it depends on the latter. De non apparentibus et non existentibus eadem est ratio. Applying the principle decided in the St. Jago de Cuba to the present case, it would follow that the contract ought to be treated as having been made with the master as such, unless the libellant was bound to show affirmatively his ignorance of the fact that the claimant was also the owner of the Patchin. But, considering that the contract was made at a place remote from the owner's residence, and that the claimant is described in it only as master, and considering also that his ownership is now set up by him for the purpose of exempting his vessel by way of exception from the general rule, I am of opinion that the onus probandi lies upon him to show the libellant's knowledge of such ownership.

"In discussing this point, I have thus far conceded that if the libellant had known that the claimant was the owner, and had contracted with him as such, no lien would have resulted from the contract. But, I infer that the late Mr. Justice Story entertained a different view of the law, and that he supposed it to be in this respect immaterial whether the contract was made with the master or owner. In The Emulous, [Case No. 4,480,] which was a suit in rem, the vessel was owned in Boston, and, having struck on a rock within the waters of that state, one of the sets of salvors contracted to tow her into port for a specific sum agreed upon. The contract, it is true, was made with the master of the schooner, though, as already observed, in the state to which she belonged. But the learned judge, in a formal exposition of what he understood to be the law applicable to cases of that nature, seems not to have recognized any distinction between contracts of this description entered into by the master, and those made by the owner in person. His language is as follows: 'The court has been asked, upon this occasion, to lay down some clear and definite rule, as to what shall be deemed salvage service, and what shall be deemed a mere common contract for labor and services. I take it to be very clear, that wherever the service has been rendered in saving property on the sea, or wrecked on the coast of the sea, the service is, in the sense of the maritime law, a salvage service. If it has been rendered under circumstances which establish that the parties have voluntarily, and without any controlling necessity on the side of the proprietors of the property saved, or their agents, entered into a contract for a fixed compensation, or upon the ordinary terms of a compensation for labor and services quantum meruerunt; in either case, it does not alter the nature of the service, as a salvage service, but only fixes the rule by which the court is to be governed in awarding the compensation. It is still a salvage contract, and a salvage compensation. It is true, that contracts made for salvage services are not ordinarily held obligatory by the court of admiralty upon the persons whose property is saved, unless the court can clearly see that no advantage is taken of the parties' situation, and that the rate of compensation is just and reasonable. The doctrine is founded upon principles of public policy, as well as upon just views of moral obligation. No system of jurisprudence, purporting to be founded upon moral or religious, or even rational principles, could tolerate for a moment the doctrine, that a salvor might avail himself of the calamities of others to force upon them a contract, unjust, oppressive, and exorbitant; that he might turn the price of safety into the price of ruin; that he might turn an act, demanded by Christian and public duty, into a traffic of profit, which would outrage human feelings, and disgrace human justice.' In The Centurion, [Case No. 2,554,] the learned judge of the district of Maine cites the case of The Emulous, as in his judgment containing a just exposition of the law of salvage. It is quite 'immaterial,' he observes, 'whether the salvors accidentally fall in with the wreck and volunteer their services, or are called upon by the owners or persons interested in the wreck to aid in saving it. It is the place where the property is situated, and the circumstances of exposure and peril in which it is found, that determine the question whether it is a case of salvage or not.' But in a later case, that of Bearse v. 340 Pigs of Copper, [Case No. 1,193,] which arose in the district of Massachusetts, and was finally decided on appeal in the circuit court, the objection was distinctly taken, that the services having been performed in pursuance of an express contract, no action in rem could be maintained therefor. The contract was made in that case not by the master, but by the proprietors in person of the property saved; but this circumstance does not seem to have been considered of any importance even by the counsel for the claimants. The objection was that the service, though of a nature which would otherwise have been a salvage service, having been performed by contract, no right accrued from it to the libellants to proceed against the property.

The district judge 'held, that as the respondents had denied in their answer, that any contract subsisted between them and the libellants. at the time the property was recovered, which also appeared upon the evidence, the libel was rightly brought against the property, whether the principle contended for by the respondents was correct or not.' The conclusion of Mr. Justice Story on the appeal also was, that the particular services in question were not embraced within the contract set up by the claimants, under which other salvage services had been previously performed by the libellants. But, he adverts to the question only as one bearing upon the amount of remuneration to be awarded, and seems not to have considered it as at all affecting the right of the libellant to maintain his action in rem. He refers also, with apparent approbation, to his observations above cited in the case of The Emulous. The just inference, therefore, appears to be that he considered all services, which, if rendered voluntarily would be salvage services, as not the less so because rendered in pursuance of an agreement for that purpose; and as entitling the salvor to the like remedies, whether rendered in the one form or the other. If the salvor, especially after the performance of the service, should take a bond or receive a bill of exchange or a negotiable promissory note in payment, it may be conceded that his remedy would be limited to a personal action on the security so taken. But there does not appear to be any solid reason for denying to the salvor a lien on the property saved, merely because the salvage service was performed at the request either of the master or the owner, and under a promise of remuneration, especially as a court of admiralty possesses an unquestionable power to shield the owners of property saved, against extortionate exactions, by reducing an exorbitant reward promised under the pressure of alarm or distress. My opinion, therefore, is that this objection is invalid.

"It was insisted, also, by the counsel for the claimant, that the persons composing the crew of the Albany ought to have been parties to the suit. When, as is commonly the case, salvage is claimed by the crew, as well as by the master and owners of the salvor vessel, and a suit is to be instituted in the admiralty therefor, it is certainly proper that all should join in such suit; and in a case where the salvage service was highly meritorious, as where it required exhausting labor, or was attended by great danger, if the master should designedly institute a suit in behalf of himself, or of himself and his owner alone, in the hope that, through the ignorance of the crew, he might secure a large reward to himself at their expense, he would expose himself to just censure; and there may be cases in which it would be the duty of the court to enquire into the reason of the non-joinder of the seamen, and to see that their rights were maintained, unless they chose voluntarily to relinquish them. But, in the present case, the crew of the salvor vessel were exposed to no extraordinary hardships or personal danger. Their services were rendered chiefly on board of their own steamer, and were substantially such as they had contracted to perform; and they probably, and perhaps very properly, deemed their stipulated wages a sufficient compensation therefor. If they had thought otherwise, it may be supposed that they would have applied to the court for redress, and it is a mistake to suppose that the right of the libellant as owner and master of the Albany, to prosecute his suit, is prejudiced by their non-joinder in the action.

"With respect to the amount of remuneration to be awarded, there are no circumstances attending the case, which demand the jealous scrutiny of the court into the reasonableness of the stipulated reward. There was scarcely room for the indulgence of a spirit of rapacity by the libellant, and there is no evidence to show that he was actuated by any such spirit. I cannot say that the stipulated sum of $450 a day is an exorbitant or even an unreasonable compensation for the sacrifices and services of the Albany, and I am satisfied that the duty of the court will be best performed by simply enforcing the voluntary agreement of the parties. I accordingly award to the libellant the sum of $1,800."

The claimant appealed to this court.

Eli Cook, for the libellant.

I. The Patchin was stranded on the rocks, and was in real and imminent danger, and the libellant's service was a salvage service. Talbot v. Seeman, 1 Cranch. [5 U. S.] 1; Conk. Adm. 279, 281. II. Salvage is allowed to the owner of a salving vessel, though the owner of the vessel saved be not present and in command of her. The allowance is made for the risk of property, &c. The Henry Ewbank, [Case No. 6,376;] Mason v. The Blaireau, 2 Cranch, [6 U. S.] 240. III. It is equally a salvage service, whether performed in pursuance of an express contract, or not. The Emulous, [Case No. 4,480;] The Centurion, [Id. 2,554;] Bearse v. 340 Pigs of Copper, [Id. 1,193.] IV. The contract was a fair one; no advantage was taken of the necessities of the Patchin; and the amount of compensation agreed upon was not unreasonable. V. The libellant performed the services required by his contract. VI. The salvor has his election to proceed against the property in rem, or against the owner or contractor in personam. Rule 19 of United States Courts in Admiralty; Conk. Adm. 790. VII. The amount is not unreasonable, and this court will not encourage appeals by a reduction of the amount allowed by the district court. The Emulous, [Case No. 4,-480.]

William H. Seward, for the claimant.

The service was not a salvage service. 1. It was not voluntary, but was rendered in pursuance of a pre-existing contract for a fixed rate of compensation. The Neptune, 1 Hagg. [Adm.] 236, 237; Hobart v. Drogan, 10 Pet. [35 U. S.] 108, 121; 3 Kent, Comm. (4th Ed.) 245; Conk. Adm. 274. 2. It was not efficient, nor was the Patchin in impending danger of shipwreck. 3 Kent, Comm. (4th Ed.) 245; Marsh, Ins. 488: Emerigon, Traite des Ass. p. 400. 3. The libellant could have recovered against Whittaker personally on the contract, even if the Patchin had been totally lost. 4. The provision in the contract, that the Albany might make harbor in case of storm, is inconsistent with the idea of a salvage service.

NELSON, Circuit Justice. I am of opinion, according to the authorities referred to by the counsel for the libellant, and by the court below, that the district court had jurisdiction of the case, notwithstanding the special agreement in respect to the compensation to be received for the service. That contract was not necessarily binding upon the vessel in peril, or upon her owner, and it would have been the duty of the court to have disregarded it altogether, and to have awarded a rate of compensation according to the principles of admiralty in salvage cases, if any advantage had been taken by the libellant in fixing the rate in the agreement. The rate thus fixed is looked at in determining the amount proper to be awarded for the salvage service; but would be disregarded, if disproportionate and unreasonable, or if extorted through the pressure of impending calamity. Under these circumstances, any agreement that might be entered into could hardly be regarded as ousting the admiralty jurisdiction. That jurisdiction is as essential to the proper protection and security of the vessel subject to salvage, as it is to the indemnity of the salvor.

I concur with the court below, that the amount agreed upon affords but a reasonable compensation for the assistance rendered by the vessel and crew of the libellant, and that the service was essentially and strictly a salvage service.

Decree affirmed.

[NOTE. A contract, written or otherwise, for salvage service, will not be enforced unless the rate of compensation is just and reasonable, and it appears that no advantage has been taken of the party in distress. Williams v. The Jenny Lind, Case No. 17,723; The J. G. Paint, Id. 7,318. For cases in which the compensation named in the contract has been reduced by the court, see The Nancy, Case No. 12,493; The Brothers, Id. 3,294; 202 Tons of Coal, Id. 14,299; The Homely, Id. 6,661; The C. & C. Brooks, 17 Fed. Rep. 548.]