LOUISA BARBARA, The (UNITED STATES v.). See Case No. 15,632.

---

## Case No. 8,532.

### The LOUISA JANE.

[2 Lowell, 295.] [1]

District Court, D. Massachusetts. Dec. Term, 1873.

SALVAGE — NO COMPENSATION AGREED — ESTABLISHED BY USAGE—ABSOLUTE AND CONTINGENT CONTRACTS.

1. Persons who assist a vessel in distress at the request of her master or owner, with no definite arrangement for compensation, must ordinarily be paid as salvors.

2. If the rate of payment is established by the usage of a port well known to both parties, the payment for salvage services may be affected or controlled by such usage.

3. The distinction sometimes drawn between absolute and contingent contracts for salvage services is misleading, and of no practical importance.

4. A contract, whether absolute or contingent, for services in saving property on the sea or in a harbor, does not oust the jurisdiction of this court of a proceeding, in rem or in personam, brought by the contractor himself.

[Cited in Chapman v. The Greenpoint, 38 Fed. 671; The Roanoke, 50 Fed. 577.]

Libel of Moses B. Tower and the Boston Tow-Boat Company, for services rendered in raising the schooner Louisa Jane, a pilot-boat of Boston, which had been sunk in the harbor near Fort Independence, Dec. 17, 1873, by a collision. The libellants asked for meet and suitable salvage. No appearance having been entered for the schooner, the court proceeded, after the return-day, to assess damages ex parte, as usual. The evidence thus taken disclosed that the libellant Tower considered himself entitled by contract to a certain amount, though it should equal or exceed the value of the schooner. Thereupon an amendment of the libel was ordered by the court, with notice to the master and supposed owner of the pilot-boat. Mrs. Louisa Jane Fowler, wife of the master, appeared and claimed the schooner, and made a deposit for costs; and, by consent, the case was heard without the formality of an answer. Much oral evidence was taken concerning the services performed and their value, and the usage of the port of Boston in such cases.

F. Goodwin, for libellants.
A. Wellington, for claimant.

LOWELL, District Judge. It was supposed by the libellants, when they brought this action, that in all cases of services in the nature of salvage the suit should be brought for salvage, and the contract, if there were one, should be given in evidence to regulate the damages. This is the practice in England, and there is no special objection to it when

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

the action is defended; but in this case the libellants' claim might possibly exceed a salvage reward, and so the frame of the libel might have misled the owner of the vessel. It was for this reason that the amendment was ordered, if the libellant intended to insist on his contract.

It has been often decided in this circuit that persons who go to the assistance of a vessel in distress, at the request of her master or owners, but with no definite arrangement for compensation, must ordinarily be presumed to go as salvors, and not as contractors or laborers to be paid a quantum meruit. Hennessey v. The Versailles [Case No. 6,365]; The Independence [Id. 7,014]; Adams v. The Island City [Id. 55]; The Susan [Id. 13,630]. The case of The Independence was very fully considered by the learned judge, and his decision was affirmed at Washington, though by a divided court. Its doctrine is doubted by Mr. Parsons (2 Pars. Shipp. & Adm. 308 [Ed. 1869] and note 4); but has been followed by Mr. Justice Clifford and Judge Sprague, in the cases above cited, not only as having been settled, but as rightly settled. The point, after all, is one of fact; and the facts proved here are wholly different from those which appeared in the cases cited. It seems that in this port there has grown up within ten or fifteen years past, and perhaps in consequence of those decisions, a regular wrecking business, conducted, in large part, by the libellant, Tower, relative to vessels that are beached or sunk within reach of assistance from Boston; that the libellant's charges are tolerably well fixed, on a liberal scale, certainly, but still upon a sort of quantum meruit, and that they are not higher than may be accounted for by their peculiar nature, and by the necessity of constant readiness on the libellant's part to perform them, on instant notice, at all times and seasons; and that they are paid without much reference to value saved or risks run, or any thing but the time and means actually employed.

It is admitted that the usage may govern this case; but whether the usage is to pay when the service is unsuccessful, is not clear, and is not admitted. This uncertainty concerning the contract makes it proper for me to examine the law of salvage as regulated by contract; and the examination must be somewhat careful and elaborate, because there are several dicta of eminent judges which have been understood to deny the jurisdiction of this court, at least in rem, over a contract for saving property at sea, when the pay was to be absolute, without regard to success.

The earliest of the remarks to which I refer was made by Mr. Justice Curtis, in The Versailles, ubi supra, and they are reiterated and expanded in The Independence [supra], where it is said by the court: "When, therefore, the subject-matter of a contract is a mere attempt to save property, and when the owner or his representative, or both, become personally liable by the contract to pay either an agreed sum or a quantum meruit for the labor and service rendered, without regard to the results, the parties do not contemplate, nor engage in, a salvage service, but quite a different service. . . . Such a contract is inconsistent in its nature and objects, and the liabilities which grow out of it, with a salvage service. As Lord Stowell declared in The Mulgrave, 2 Hagg. Adm. 77, it is a case of contract, and not one of salvage. I do not intend to be understood, however, that a case in which a contract exists may not also be a case of salvage. The parties may agree on the amount of a salvage compensation, or on the principles upon which it shall be adjusted; and such agreements, fairly made, no advantage being taken of ignorance or distress, are readily upheld by the courts; (citing certain cases). Nor do I intend to express any opinion on the question whether the admiralty has jurisdiction in rem to enforce a contract for assisting a vessel in distress, which are not salvage services."

A similar division of possible contracts is made by the learned judge in The Susan [supra], in which he calls a contingent agreement by the name of "salvage," and refuses that name to one in which the pay is to be absolute. He, however, makes no question about jurisdiction; and neither of these cases decided any such point: they decided, as I have said, that a salvage service, in the strictest sense, is to be inferred, when no definite bargain of any sort is made. Then, there are three cases in which salvage suits have been dismissed, and in which the courts have, to a greater or less extent, appeared to rely on the fact that the payment was not to be contingent on success. The Whitaker [Case No. 17,525]; Squire v. One Hundred Tons of Iron [Id. 13,270]; The Marquette [Id. 9,101]. I shall show hereafter that these cases do not decide the point now under consideration, because they were all suits by sub-contractors, or laborers under contractors, and not by the contractors themselves.

The differences between contract and salvage are very marked, and pervade the whole subject; but they are nearly as important where the contract is contingent, as where it is absolute; and they are not, in this country, jurisdictional differences. Mr. Justice Curtis, as we have noted, cites The Mulgrave, 2 Hagg. Adm. 77; but he is not accurate in citing it as an absolute contract for payment at all events. The report clearly shows, I think, that the contract was contingent, though nothing turned on that point, and it was not mentioned in the argument or the judgment. Lord Stowell, in contrasting contract and salvage, in his decision of that case, was adverting to the point, only too well established at that time in England, that the admiralty was not permitted to hold pleas of contract. Even seamen, whose general right

to sue in that court was never denied, could not recover there any thing which was due by usage, or by any contract which was at all out of the usual course of shipping articles. It is my impression that the judges of the queen's bench imagined that Dr. Scott and Dr. Robinson, who certainly held a lieutenant's commission, had been promoted from the forecastle of a man-of-war, and could not understand a usage or stipulation that was not familiar to every foremast hand. At all events, they were prohibited from enforcing them; and, whenever ship owners became bankrupt, a painful failure of justice was likely to occur, by reason of the inability of a whalesman, or any other sailor whose contract was peculiar, to enforce his just rights against the ship itself. The Sydney Cove, 2 Dod. 11; The Mona, 1 W. Rob. Adm. 137; The Riby Grove, 2 W. Rob. Adm. 52; The Debrecsia, 3 W. Rob. Adm. 33. The last of these unfortunate cases was The Harriet, 1 Lush. 285, decided in March, 1861. In May of that year, parliament came to the relief of the admiralty court, made it a superior court of record, and in many other respects strengthened and enlarged its powers, and in section 10 of the statute gave it jurisdiction of "wages due under a special contract." 24 & 25 Vict. c. 10. It had already, in August, 1840, given the court power to deal with all claims and demands whatsoever in the nature of salvage or towage, or for necessaries supplied to a foreign vessel. 3 & 4 Vict. c. 65, § 6. In commenting upon the act of 1861, soon after its passage, a learned author said: "The jurisdiction of this court did not (before the statute) extend to rights and questions arising upon contract. It determined the reward of merit and the compensation for injuries; but stipulated rights, though held in view in advancing to a result, never formed the basis of its proceedings:" Macl. Shipp. (1862) Supp. 56. See the remarks of Dr. Lushington in The Ocean, 4 Notes, Cas. 33.

We see, then, that until the reign of the present sovereign of Great Britain the distinction between service and contract, whether the service were in the nature of salvage, or wages, or any thing else, was often a most important jurisdictional distinction; and, in contrasting salvage and contract, Lord Stowell was referring to something which went to the very power of the court. And so he has usually been understood, and the case has been often cited in that sense. Dr. Lushington, however, who was of counsel in the case of The Mulgrave, has explained it away to a considerable extent. He says it only decided that when the defendant in an action for salvage sets up a valid contract, and pays the money into court, the decree goes for him, as in any other case of a good tender. The Catherine, 6 Notes Cas. Supp. 43. Since this decision there have been a great many cases of the same sort; and it is the practice in England for the libellants (or whatever they are called) to demand salvage in all cases, and, if they rely on a contract, to give it in evidence, very much as at common law a plaintiff would introduce a promissory note under a count in indebitatus assumpsit. If, on the other hand, the owner of the property desires to set up the contract, he does so, together with a tender. The True Blue, 2 W. Rob. Adm. 176; The Jonge Andries, Swab. 226, affirmed, Id. 303; The Henry, 15 Jur. 183; The Crus. V., Lush. 583; The William Lushington, 7 Notes Cas. 361.

The English practice is certainly very ingenious. It appears to be understood that a valid contract bars an action for salvage, even since the act of 1840; but the courts will not admit it as a bar, unless the money due under it is paid into court for the use of the plaintiff. It has not been directly decided since 1840 whether the court could entertain a suit founded distinctly on a special contract for saving property wrecked or in distress at sea. The act, using the expression, "demands in the nature of salvage and towage," would seem to be sufficient; but so late as 1861 it was decided that there was no jurisdiction of a special contract for towage. The Martha, Lush. 314. However, the practice avoids all such questions.

In this country, though the distinction between contract and salvage must always be of great consequence in awarding the damages, it is not, and never has been so, in a jurisdictional point of view. Thanks to the great jurists, who were called upon to interpret the grant of admiralty jurisdiction contained in the constitution, we have retained a great part of the powers which anciently and of right belong to this court. We hold pleas of all maritime contracts, absolute or contingent, without being obliged to resort to fictions or indirections of any sort.

It cannot be doubted that a contract to raise a vessel, sunk in navigable waters, is a maritime contract. And the mode in which payment is to be made cannot, in this country, have the least bearing on that question. A payment in gold is quite as much within our cognizance as one in pearls gathered from under the sea, though that difference would probably have been vital in the eyes of the old common law of Lord Coke's time. A payment absolute cannot convert a maritime contract into one not maritime, though a contract of either kind may give a concurrent jurisdiction to the courts of common law. Many maritime contracts, such as those for freight, seamen's services, &c., are, or formerly were, contingent upon the completion of the adventure; but many others are not, or are sometimes contingent and sometimes not, according to circumstances.

A contract for saving wrecked property being maritime, the property saved is hypothecated for its fulfilment. This is so of all maritime contracts, whether contingent or absolute. The apparent exception of supplies to a domestic ship is an accident, the

relic of common-law usurpations, and confined to the jurisprudence of England and the United States, in the latter of which the several states have taken great pains to correct it. Indeed, I consider the lien for towage to be quite decisive of this case. This contract was, in great part, an agreement for towage, and in the rest for the use of lighters in similar work; and I am not aware of a case in which it has been held, or even argued, that such a contract does not create a maritime lien.

The only case in which the point has been directly adjudged is The A. D. Patchin [Case No. 87], in which the contract was absolute, and an argument was addressed to the court founded on that circumstance. Judge Conkling's able opinion in support of the jurisdiction in rem in that case was in all respects sustained by Nelson, J., and has never been directly questioned or met, excepting by a query of Curtis, J., which is by no means an expression of opinion, as I shall show.

Mr. Justice Story, in his well known remarks in The Emulous [Id. 4,480], takes no such distinction, but speaks alike of all contracts. "I take it to be very clear," says the learned judge, "that whenever the service has been rendered in saving property upon the sea, or wrecked on the coast of the sea, the service is, in the sense of the maritime law, a salvage service. If it has been rendered under circumstances which establish that the parties have voluntarily, and without any controlling necessity on the side of the proprietors of the property saved, or their agents, entered into a contract for a fixed compensation, or upon the ordinary terms of a compensation for labor and services quantum meruerunt; in either case it does not alter the nature of the service as a salvage service, but only fixes the rule by which the court is to be governed in awarding the compensation. It is still a salvage service and a salvage compensation."

I will now consider the cases. which at first sight seem to be adverse to the jurisdiction. They are three.

1. The Whitaker [Cases Nos. 17,524, 17,525]. There Holbrook had agreed to launch a stranded vessel for $900, and. after trying and failing to accomplish any good result. he employed Otis, who worked with his men. and succeeded; but thinking they had earned more than the agreed sum, they libelled the vessel (which was owned in Maine) as material-men. The court dismissed the libel, on the ground that if they were material-men, which he evidently did not consider them to be, they had no lien, because they worked under one who had no power to bind the vessel beyond $900 in any event, and he intimated that some one might recover that sum in an action for salvage. In the second suit, which was for salvage, a decree was entered for Otis and Holbrook for $900; but the men who had worked by the day under Otis were not admitted to be salvors, and

this for the reason that their contract clearly showed that they looked to Otis personally for their pay in all events, whether the vessel were saved or not. In that case, is a head-note, which appears to lay down the general proposition that an agreement to labor for an agreed compensation. to be paid at all events, displaces a claim for salvage. But it is evident that all that the case decides is, that day-laborers, under a contractor who has undertaken to save a vessel for a fixed sum, cannot be joined with the contractor in suing the vessel for that sum. The decision, therefore, in the second case of The Whitaker [supra] was substantially the same as in the first; namely, that Otis had no power to impress the vessel with liens, whether they were called by one name or another. It is, in this respect, precisely like The True Blue, 2 W. Rob. Adm. 176, where two smacksmen had undertaken to relieve a vessel for a certain sum. and afterwards engaged other smacks to assist them; and it was held that these assistants must look for their compensation to their immediate employers, and not to the vessel saved. If it were otherwise, the original contractor might involve the property to an amount exceeding the whole contract price. So in the case at bar, if Tower had undertaken the job for a fixed price, or for a fixed proportion of the value saved, the tow-boat company, knowing the facts, could not be permitted to assert a lien which might override the agreement. As the contract here was for a quantum meruit, I do not know that there is a valid objection to the tow-boat company being a party plaintiff jointly with Tower, to the extent of what is reasonably due for its part of the services. This depends on whether Tower had any express or implied authority to employ such services on account of the owner. In The Whitaker and The True Blue [supra], the contract being for a fixed sum, there could be no implied authority to subject the vessel or her owners to any other or different payment.

2. The Marquette [Case No. 9,101], decided by Judge Longyear. That case was like The Whitaker. and a sub-contractor, who had bargained with the contractor for pay at all events, was not allowed to libel the vessel alone. The learned judge cites The Whitaker and The Independence, and explains the former case very clearly. He does say, as one reason why the libel cannot be maintained, that the pay was not to depend on success, and this form of contract, he says, creates only a personal obligation, and not a lien. This is true in the case of a sub-contractor, and is probably all that is intended.

The last case is Squire v. One Hundred Tons of Iron [Case No. 13,270], where the libellant had let out certain tools to a wrecker, and Judge Blatchford held that he had no action in the admiralty, personal or real. This appears to be like the other two cases.

That this is the true significance of these

decisions, is shown by several cases in England, in which the direct question was litigated whether a contractor could proceed in the admiralty for his reasonable compensation, as well as for the money expended in saving a wreck; in all of which the decision was favorable to the jurisdiction. The discussion was most elaborate in The 'Happy Return, 2 Hagg. Adm. 198, though that was not the first case of the kind. There a merchant was employed under a power of attorney from the owner of the vessel, with the consent of the underwriters, to save whatever could be rescued from a sunken ship. His payment does not appear to have been contingent upon success. Sir C. Robinson decreed in his favor for his expenses, and a reasonable compensation for his services, though he said it was not a case of salvage, strictly so called. A similar course was followed in The Traveller, 3 Hagg. Adm. 372; The Watt, 2 W. Rob. Adm. 70; The Purissima Concepcion, 3 W. Rob. Adm. 181; The Favorite, 2 W. Rob. Adm. 255; and there are others. In The Favorite, Dr. Lushington is reported to have said, "Although I cannot view his services in the strict character of salvage services, but rather of a successful and meritorious agency," &c., decreeing for the plaintiff.

It will be observed that in none of these cases were the laborers, or sub-contractors, or furnishers of materials, made parties to the action; and, if they had been, I have no doubt their asserted liens would have been rejected, for the reason that they had contracted with a person, and under circumstances which repelled the inference that any lien was or could be stipulated for; as in The Whitaker and The Marquette.

When Mr. Justice Curtis, in giving judgment in The Independence [Case No. 7,014], speaks of a contract to bar salvage, he must have had reference only to its preventing the court from assessing a salvage compensation on the usual liberal rule of the maritime law. Indeed, he twice expresses himself so, though there are other passages which have been understood to bear a wider meaning. But that I am right in my construction of his language is clear from this, that, when he comes to speak of the jurisdiction in rem, he carefully avoids expressing an opinion, and refers to The A. D. Patchin [Id. 87]. I understand in the same way the expressions used by the court in Coffin v. The John Shaw [Id. 2,949]; Adams v. The Island City [Id. 55]; The Camanche, 8 Wall. [75 U. S.] 448.

I conclude, therefore, that whether the libellant Tower was to be paid at all events or not, which is doubtful, yet in either case he can recover against the vessel the sum due him under his contract.

The judge then examined the evidence of services, and made up the account by items, awarding in all $966.00.