## CHAPMAN *v.* THE ENGINES OF THE GREENPOINT.

*(District Court, S. D. New York.* May 10, 1889.)

1. SALVAGE—SPECIFIC CONTRACT—MARITIME LIEN.

An agreement to pay a salvor a specified sum if' he succeeds in raising the engines of a sunken steamer within a certain time, and a larger sum if it requires a longer time, does not deprive the salvor of his right to a maritime lien.

2. SAME—DOMESTIC VESSEL.

A salvage service carries with it a maritime lien on the things saved, whether the vessel is foreign or domestic; the rule as to repairs and supplies, not to be extended by analogy.

In Admiralty.

*Wing, Shoudy & Putnam,* for libelant.

*Goodrich, Deady & Goodrich,* for claimants.

BROWN, J. The steam-tug Greenpoint having been sunk, the libelant was employed to raise her engines under a stipulation that he should be paid $150, besides towage, if he succeeded in raising the engines within two days, and a larger sum if it required a longer time. Having succeeded in raising the engines, and not being paid, he libeled them for his compensation, as for salvage. Other libels were also filed against the engines for seamen's wages on board the tug, and also for supplies of coal. The owner did not defend; and, the engines being sold by the marshal, the proceeds paid into court are insufficient to discharge the several claims. The commissioner has allowed $215 for the libelant's claim, as for salvage, according to the agreement, which I find to be reasonable. The supply men, under leave to litigate the claim of Chapman, contend that his demand is no lien on the vessel, because the tug was a domestic vessel, and because the compensation was to be paid at all events, and, therefore, not a salvage contract, nor entitled to a maritime lien.

1. The evidence does not show that the libelant was to be paid a specified sum at all events, whether he succeeded in raising the engines or not. On the contrary, though the bargain was oral, it is evident that he would not become entitled to any compensation unless he succeeded in raising the engines. Nothing short of a distinct agreement to pay the stipulated sum, whether the service be successful or not, will change the character of a salvage service into a mere ordinary contract of employment, or deprive it of its maritime lien. *The Camanche,* 8 Wall. 448, 477; *Adams v. Bark Island City,* 1 Cliff. 210. In the case of *The Louisa Jane,* 2 Low. 295, LOWELL, J., upon a careful review of the authorities, held that even an absolute contract to pay would not change the nature of the service, or prevent a maritime lien. Agreements between the parties fixing a definite sum to be paid for services of a salvage nature are treated as attempts merely to regulate the amount of compensation, not otherwise affecting the nature of the contract, or the right to a lien, if successful. Such agreements are very common, and are upheld by courts of admiralty, if

reasonable in amount; if oppressive or extortionate, they are disregarded. *The Jenny Lind*, Newb. Adm. 443; *The A. D. Patchin*, 1 Blatchf. 414; *The Emulous*, 1 Sum. 207; *The Adirondack*, 2 Fed. Rep. 387.

2. A salvage service carries with it a maritime lien on the things saved, whether the vessel is foreign or domestic. The distinction between foreign and domestic vessels, as respects liens, established by the case of *The General Smith*, 4 Wheat. 438, had reference only to repairs and supplies. It was derived from the exceptional rule of the English law, in opposition to that of most, if not all, other maritime nations. It was reaffirmed in the case of *The Lottawanna*, 21 Wall. 558, not upon any general principle, but solely on the doctrine of *stare decisis;* and it is nowhere intimated that the rule as to repairs and supplies is to be extended by analogy to other contracts. It has no application to towage, to pilotage, to charter-parties, to freights, or to damage liens. That the rule as to repairs and supplies, which early obtained a foothold in our maritime law, was not suited to the general necessities of this country, is sufficiently attested by the fact that in nearly all the states liens upon domestic vessels have been provided for by statute to supply the exceptional defects of our maritime law; and the admiralty courts recognize and enforce those liens. The statutes do not cover salvage, because the maritime law universally and from time immemorial has given a maritime lien for such services; and there was therefore no need of any statutory provision. The raising of sunken cargo, or of sunken vessels, their machinery and appurtenances, is one of the most common forms of salvage service. The books are full of such cases. By immemorial usage such services are rendered upon the credit of the property saved, as well as of the employer also, if there is a previous contract. In the case of *The Louisa Jane, supra*, LOWELL, J., observed that he was not aware of a case in which it had been held, or even argued, that such a contract does not create a maritime lien. The majority of the numerous salvage cases in this district have arisen upon domestic vessels. To deny the lien merely because the vessel is a domestic one would be, not only a reversal of the immemorial law, but a denial of the security always heretofore attached to services deemed to rank among the highest in merit and in privilege. The cases cited by counsel proceed, I think, upon the ground that in the particular circumstances the service or the contract was not properly one of salvage. *The Venture*, 26 Fed. Rep. 285; *The D. S. Newcomb*, 12 Fed. Rep. 735; *The Enright*, Id. 157. The exceptions are overruled, and the claim for supplies must be postponed to both the others.