### THE ROANOKE.

### LEATHEM *et al. v.* THE ROANOKE.

*(District Court, E. D. Wisconsin. May 16, 1892.)*

1. SALVAGE—CONTRACT.
    A contract to pay for salvage service a fixed price absolutely, without respect to success or failure, does not change the character of the service. It remains a salvage service, but the measure of compensation is gauged by the contract, and not by the danger encountered, or the value of the property salved.
2. SALVAGE—JURISDICTION—LIEN.
    A contract to pay a fixed price for a salvage service, in any event, does not affect the admiralty jurisdiction, nor the lien granted by the maritime law for salvage service.
3. SALVAGE—FRAUDULENT CONTRACT.
    A contract between the salvors and the owner of the ship, for a fixed sum payable in respect of the ship, and for a larger sum payable in respect of the underwriters, is tainted with fraud, and will not be enforced.
4. SALVAGE—MASTER'S CERTIFICATE—FRAUD.
    Settlements by the master, deliberately and fairly made, are upheld. But such settlements, made pursuant to and in furtherance of a contract to defraud underwriters, will not be sustained.

5. SALVAGE—INEFFICIENCY OF WRECKING OUTFIT—HIRING BY THE DAY.
    Compensation cannot be abated for inefficiency of wrecking material hired at a fixed price by the day, and subject to discharge at the will of the master. Retaining the service, the contract compensation must be paid.
(*Syllabus by the Court.*)

In Admiralty. Libel by John Leathem and others against the propeller Roanoke for salvage. Decree for libelants.

*M. C. Krause*, for libelants.

*F. M. Hoyt*, for respondent.

JENKINS, District Judge. The propeller Roanoke, laden with lumber, on the evening of the 8th day of August, 1891, set out on a voyage from the port of Menominee, Mich., to the port of Chicago, Ill. Leaving her dock, and in winding to go out, she struck upon a sunken ledge of rocks, owing to the displacement of a buoy; stove a hole 26x20 inches in her bottom, on the starboard side near the keel, and some 30 feet forward of her stern; and sank in 12 feet of water. The deck load was removed upon lighters and taken ashore. The master thereupon, on the 9th day of August, hired of the libelants a steam pump, which was placed upon the vessel, the libelant Leathem accompanying it and superintending its operation. The vessel was floated, towed alongside the dock, when, in consequence of an obstruction in the hole getting free, she again filled and sank in 10 feet of water. The one pump being insufficient, a second and smaller pump of the libelants was engaged, and, on the 10th of August, placed in position on the vessel. Both pumps proving inadequate to the task of raising the vessel, a third pump was procured of other parties on the 13th of August, and, by the combined action of the three, the vessel was raised on the 14th day of August. The cargo was removed, and the hole battened up with bags filled with sawdust, and planks braced against the deck. The vessel then, on the 15th August, proceeded for repairs to Milwaukee, having the two pumps of the libelants aboard, and at work to keep her free. At midnight, on the 15th August, when some three miles off Sheboygan, the water was found to be gaining, coming up nearly to the fire-hole door. The libelant Leathem was aroused from sleep, took charge of the operation of the pumps, working them beyond their ordinary capacity, and succeeded in lowering the water in the hold, and keeping it from the fires. The vessel was headed for Sheboygan, and reached that port at 3 A. M. on the 16th August. She made fast to the dock, and about 10 A. M. listed to starboard, and sank in 12 feet of water. This was caused by the plugging in some way escaping from the hole in the vessel. Various attempts between the 17th and 26th August were made to right the vessel. She was raised several times, but would at once list to one side and sink. Another pump was procured from Milwaukee, and placed on the vessel on the 26th August, and on the 28th of August the vessel was raised, but, while the dry dock was being made ready to receive her, she listed to the port side and sank, throwing the boiler of one of the pumps into the river and breaking connections. The boiler

was recovered, the connections repaired, the three pumps again put in operation, and the boat was finally raised and placed in dry dock on the 5th day of September.

The libel was filed *in rem*, in a cause of salvage, to recover the reasonable worth of the service. At the hearing it was amended to comprehend a contract in the nature of salvage, and to assert a specific contract for the use of two pumps at an agreed rate of $45 and $35 per day, respectively. The libel also asserted an accounting with the master and the owner, and certification of the libelants' claim by the master with the consent of the owner. The answer, *inter alia*, asserts that at Sheboygan the libelants and claimant agreed upon compensation for the pumps at the rate of $45 and $35 per day, respectively, less 40 per centum; and that the certification of libelants' claim was upon the express agreement that a deduction of 40 per centum should be made from the charges for the use of the pumps, and that, prior to the filing of the libel, the proper amount under such agreement had been offered to and refused by the libelants. The answer also asserts unnecessary delay and misconduct on the part of the libelants, and that the pumps were inefficient and in bad order and condition, and unfit for the service contemplated. The claimant also insists that the contract service alleged in the amendment to the libel is not a proper salvage claim, and not cognizable in the admiralty as a maritime lien; and also that the libelants and claimant are residents of the state of Wisconsin; that the contract for the services rendered was made at Sturgeon Bay, in the state of Wisconsin, and credit is therefore presumed to have been given the owner, and not the vessel; that a lien for such services can arise only when the debt is created within a state jurisdiction other than that in which the owner resides or to which the vessel belongs.

The proofs show that the contract was absolute to pay for the service of the pumps in any event. The right to compensation here is consequently not affected by success or failure, nor is the amount thereof measured by the dangers incurred. This is not, therefore, a case of salvage, pure and simple; for that is a service rendered spontaneously by a volunteer adventurer in the recovery of property from loss or damage at sea, under responsibility of restitution, and with a lien for his reward. *The Neptune,* 1 Hagg. Adm. 227, 236; *The Thetis,* 3 Hagg. Adm. 14, 48. The volunteer salvor has, in case his efforts are unsuccessful, no recourse against the owner. There must be not only the attempt, but an actual rescue. The principle is that, without benefit, salvage is not payable. If the property be saved and restored to the owner, he may be held *in personam,* because by the restoration he has received the benefit of the salvor's services. *The Sabine,* 101 U. S. 384. The services here were not those of a volunteer, but were rendered under contract; the right to compensation was not contingent upon success; the amount of compensation was absolute, a *per diem* remuneration payable in any event; the service could be ended at any time at the will of the master. Within the rule stated in *The Camanche,* 8 Wall. 448, 477, that a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will

...ar a claim for salvage, the demand cannot be considered a salvage claim pure and simple, for which compensation is to be awarded upon the considerations by which courts of the admiralty are in such cases governed. But, because the compensation was not contingent upon success, the character of the service rendered is not changed. *The Emulous*, 1 Sum. 210; *The Camanche*, *supra*. The service rendered was a salvage service, but compensation is measured by another rule,—not by the danger encountered, or by the value of the property salved, but by the term of the contract, subject to the scrutiny of the court in prevention of fraud or undue advantage. *Steamship Co.* v. *Anderson*, 13 Q. B. Div. 651, 662. That is the only change wrought by the right to compensation being made absolute, and not contingent upon success.

The jurisdiction of the court of admiralty is not thereby affected. It is not open to discussion that the admiralty jurisdiction comprehends all marine contracts relating to the navigation business or commerce of the sea. *Insurance Co.* v. *Dunham*, 11 Wall. 1. So those rendering services in the nature of salvage services, under contract, may proceed in the admiralty *in personam* against their employers for compensation, although unsuccessful in saving property, if by the contract the right to compensation is not made contingent upon success. *The Sabine*, *supra*.

It is nevertheless insisted that, however it may be as to proceedings *in personam*, no proceeding *in rem* will lie upon such a contract, upon the ground that, where a service, which would otherwise be a salvage service, is performed by contract, the salvor has no right to retain the property, and so cannot proceed against it. The contract here was maritime in its nature. The service rendered was a salvage service, and meritorious. But for the fact that the compensation was not contingent upon success, there could be no question that a maritime lien existed upon the vessel for the service rendered. But for the fact that the measure of compensation is limited by the contract, it would be gauged by the liberal standard adopted in the admiralty, having regard to the risks assumed and the value of the property saved. These circumstances do not impress me as availing to deny the lien. The contract was one within the scope of the master's authority. His action was essential to the preservation of vessel and of cargo from a peril of the sea. *Kemp* v. *Halliday*, 34 Law J. Q. B. 246. Such a contract binds the vessel. Every maritime contract made by the master within the scope of his authority under the maritime law hypothecates the ship, giving the creditor a lien thereon for his security. *The Undaunted*, 1 Lush. 90; *The Paragon*, 1 Ware, 322; *The Williams*, Brown, Adm. 208; *The Louisa Jane*, 2 Low. 295. It is true the salvor under a contract has no right to retain the property, but the right of retainer is one thing, and a lien another and different thing. Possession is not essential to the validity of a lien, and for salvage service there is a lien by the maritime law. *Cutler* v. *Rae*, 7 How. 729.

This conclusion renders it unnecessary to consider the further contention of the claimant that the contract for the service was made within the state of the owner's domicile, and therefore that no lien arises. The

lien here exists, as I conceive, by the maritime law, irrespective of any credit to the owner, or of the position asserted that every port in the state of the owner's domicile is to be deemed the home port of the ship.

Coming, now, to the questions of the fact involved, the first one for consideration is the compensation contracted to be paid for the use of the two pumps. The contention of the libelants is that the agreed price was $45 and $35 a day, respectively; of the claimant, $35 and $25. Without stopping to discuss the evidence in detail, I am satisfied that the claimant's contention is supported by the proofs; that the libel originally filed proceeded upon a *quantum meruit*, for the service is of persuasive force in the conflict of evidence. I find, however, that the contract did not include the services of an engineer to operate the pumps. I do not find that any agreement was reached between the parties in that regard. Leathem accompanied the pumps, as was his custom, and, as he asserts, "to see that they were used right," the master undertaking to furnish an engineer. Afterwards Leathem operated the large pump, and claims for his services $10 a day for each pump, although, as matter of fact, the smaller one was operated by the engineer of the ship. Leathem was not a licensed engineer. He had some knowledge of operating engines in mills, but was manifestly not an expert at the business. He did, however, with the consent of the master and of the owner, operate the larger pump, and should receive a fair compensation for that service. I see no reason to allow him more than the usual rate shown to be paid for such service, $5 a day, and that compensation should be limited to the days he so actually operated that pump as engineer. So nearly as I can estimate the time from the evidence, which is quite uncertain upon the proof, I determine the number of days he was so employed at 18 and the libelants are allowed $90 for that service.

It is asserted by the claimant that at Sheboygan while the attempts to raise the ship were in progress, and some eight days before she was placed in dry dock, it was agreed between the owner and Leathem, one of the libelants, that the bill for the service of the pumps should be rendered at the rate of $45 and $35 per day, respectively, and that there should be allowed the owner a deduction of 40 per cent. from such charge. The vessel was valued at $30,000, and was not insured; the cargo at $3,800 or $3,900, and was insured. In other words, that there was a secret arrangement, and the cargo was to be charged in general average with the prices stated, but the owner was in fact to pay only 60 per cent. of the amount charged. It was testified by the claimant that at the time of the alleged agreement he had become discouraged at the repeated failures to keep the ship afloat, and was negotiating with others to raise her; that this fact coming to the knowledge of Leathem, one of the libelants, he suggested that there was no need to pay the demanded price of $1,000 to raise the ship; that it should not cost over $250 more to raise her; that it was "an insurance job," and "we have got to get these bills up as high as we can;" and that the cargo would pay $9\frac{2}{3}$ per cent. of the cost. In this there is corroboration by the master, except

as to the amount of the rebate, he leaving the room before the close of the negotiations. On the 7th September the master certified to the bill at the rates specified, without any rebate mentioned therein. He asserts that at that time he spoke to Leathem concerning it, who replied "that will be an after consideration." In this he is corroborated by his letter to the owner inclosing the bill, and asking authority to certify it, in which he states the remark of Leathem as to rebate as given in his testimony. Leathem denies this arrangement *in toto*, asserting that no such conversation ever occurred; that the terms of the original contract, as he claimed it to be, viz., $45 and $35 per day for the pumps, were never questioned or disputed by the master; that the subject of rebate was never mentioned, and that the master certified to the bill without reserve and without suggestion of rebate; that he knew the ship was not insured and that the cargo was insured; and that he understood at Menominee from the agent of the insurers of the cargo that 9 per cent. of the expense of raising the vessel would fall upon the insurers. The claimant asserts that he assented to the arrangement without any design to defraud the underwriters of the cargo, and without intention to present other than the actual bill of expenditure, and solely because he discovered that, with the rebate offered, the *per diem* cost of the pumps to him would be $12 less than the contract price as claimed by the master. He insists that Leathem in proposing this arrangement overreached himself, failing to perceive that thereby he would receive less than entitled to by the contract as claimed by the master.

I am persuaded by the proofs that there was an agreement for a rebate. Whether or not the rate agreed upon was 40 per cent. may admit of doubt. It would seem unnatural for Leathem to assent to a deduction which would abate his compensation for the use of the pumps, to that date, as conceded by the libelants, by some $256, exclusive of all compensation as engineer; and this without any resulting benefit to himself, and solely to enable the claimant to recover a lesser amount from the underwriters. If that was the rate agreed upon, it indicates either a lack of discernment and inattention to self-interest not apparent from the appearance of Leathem in the witness box, or a generous impulse growing out of the "hard luck" attending the raising of the ship. The latter seems the only probable motive for such an agreement by him. It is not necessary to determine the fact. It suffices that there was an agreement for a rebate, whatever the rate. This agreement was suggested by Leathem to the claimant with a view to the latter obtaining from the underwriters of the cargo a larger salvage than he ought. I think it was accepted with like intent and purpose on the part of the claimant. His avowed reasons for acceptance impress me as uncandid. Leathem suggested, "It is an insurance job; we have got to get these bills as high as we can." The claimant demurred to the price stated, asserting they were not according to the contract. Leathem said, "What is the matter with a rebate?" The claimant answered, "I listened to that readily, and said, 'All right.'" The master's version is that the owner replied, "Oh, that is different." All this occurred before

any rate of rebate was suggested. Such an offer is susceptible of but one interpretation. It was a bald suggestion to defraud the underwriters. The claimant's ready assent compels the conviction that he was quick to entertain the offer. Honesty does not listen to suggestions of fraud with such easy complacency, or yield with such ready assent. Honesty is more robust. I am satisfied that both parties conspired to perpetrate a fraud upon the underwriters. Indeed, it was asserted by counsel, at the bar, without dissent, that such agreements are not infrequent in cases of salvage, and that marine underwriters well understood that they were thus imposed upon. If insurance companies submit to such imposition, they are culpable, in a sense condoning the offense. Such contracts will not be tolerated in courts of justice. They will not consider them nor enforce them against either party. They will only deal with them in the way of relieving innocent victims of the fraud, or of punishing the guilty participants therein.

It is suggested that the owner could not have contemplated a fraud, because the cargo could not be subjected to any part of the expense accruing subsequently to its removal from the ship. Ordinarily such subsequent expense is incurred to save the ship, and not for the benefit of the cargo. There may, however, be cases where such subsequent expense would constitute a claim to general average. It may be that here the cargo is not liable in general average for any portion of the expense of raising the ship, whether before or after its removal. It may be that it may legally be charged for a proper share of the subsequent expense. That depends upon facts not disclosed by this record, and is a question not in controversy here. See *McAndrews* v. *Thatcher*, 3 Wall. 347; *Kemp* v. *Halliday*, 6 Best & S. 723, 34 Law J. Q. B. 233, 243; *Job* v. *Langton*, 6 El. & Bl. 779, 26 Law J. Q. B. 97; *Moran* v. *Jones*, 7 El. & Bl. 523, 26 Law J. Q. B. 187; *Walthew* v. *Mavrojani*, L. R. 5 Exch. 116.

However that may be, it is clear that both parties supposed that the cargo was liable in general average, and acted upon that presumption. Counsel for claimant suggested that the claimant knew otherwise. There is nothing to support the suggestion. To the contrary, from the occupations of the parties, the libelant would be in better position to know the facts and the law applicable in such case than the claimant. If both knew the cargo was not liable, there is no possible motive shown for any such agreement for rebate.

It is urged by the libelants that the bill certified by the master should be held conclusive of the contract of hiring. Settlements by the master, when deliberately and fairly made, are upheld. *The Senator*, Brown, Adm. 545. This bill was, however, presented and certified pursuant to and in furtherance of the corrupt agreement considered. It is tainted with fraud, and cannot be sustained. It does not speak the agreement of the parties. It declares the fraudulent contract sought to be imposed upon the underwriters.

With respect to the claim to abatement of the amount due because of alleged want of good faith and skill on the part of the libelants, unreasonable delay in the work, and inefficiency of the pumps, but little

need be said. There was incompetency somewhere with respect to this work. It cannot otherwise be accounted for that so much time should have been consumed in raising the ship within a harbor and in smooth and shallow water. That incompetency, I think, rests with the master and owner, not upon the libelants. The latter were not engaged as wreckers, and were not in control of the work. They hired to the master their pumps, and operating service for one of them, at a *per diem* compensation. They were subject to discharge at any time at the will of the master. He, not they, controlled the operations. If the pumps were inefficient, or Leathem unreasonably prolonged the work, the master had the remedy in his own hands. He could put an end to the employment at will. Retaining the service, the claimant cannot refuse compensation, or claim abatement of the contract price. *Starke* v. *Crilley*, 59 Wis. 203, 18 N. W. Rep. 6. I pronounce for the libelants upon the basis stated, with interest from the date of filing the libel, and for costs.