DANIEL et al. v. A CARGO OF LUMBER.

In re ST. PAUL FIRE & MARINE INS. CO.

(District Court, S. D. Alabama, S. D. February 22, 1917.)

No. 1624.

SALVAGE ⬤⟶11—RIGHT TO COMPENSATION—INCIDENTAL SALVING OF CARGO.

Libelants, under a contract with the owner of a lumber laden schooner, which had been turned over and sunk in a storm and was lying upside down on the bottom, righted the vessel and raised her, together with such of the lumber as was below the deck or was still fastened upon the deck, which was saved to the insurer, to which it had been surrendered. *Held*, that the saving of the cargo was a salvage service, for which libelants were entitled to compensation, but as a service of a low order, since it was incidental to the salving of the vessel.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. § 21.]

In Admiralty. Suit by F. M. Daniel and F. B. Annan against a cargo of lumber; the St. Paul Fire & Marine Insurance Company, claimant. Decree for libelants.

H. T. Pegues, of Mobile, Ala., for libelants.
Rickarby & Austill, of Mobile, Ala., for claimant.

ERVIN, District Judge. This is a libel filed claiming salvage of a lot of lumber formerly loaded on the schooner Emma S. Lord, of Bangor, Me. The great bulk of this lumber was loaded in the schooner under her decks, and a portion of the lumber was loaded above decks and fastened down, as is customarily done. It appears that the schooner loaded in Mobile and started out, when the storm of July 5, 1916, caught her in the lower bar and blew her out of the anchorage, blowing her masts off and turning her over in about 13 feet of water.

The cargo of lumber has been turned over to the insurance company by the shipper and is now claimed by the St. Paul Fire & Marine Insurance Company. The vessel was lying upside down, with her decks resting upon the muddy bottom, when a contract was made between libelants and J. M. Scott, the owner of the vessel, under the terms of which the libelants agreed—

"to proceed immediately to work upon said schooner where she now lies, to turn same over and get her afloat, and to save all of her appurtenances and equipment that can be practicably saved, and deliver said schooner, with the salved appurtenances, righted at some dry dock in the city of Mobile, Ala. Second parties further agree that, if said vessel can be pumped out after being righted by making temporary repairs at a cost not exceeding $50, they will do so; but if said schooner cannot be pumped out without incurring expenses above said amount, first party will accept her in Mobile full of water. * * * It is understood that the parties of the second part shall not be held responsible for such damage as may occur to said schooner in the conduct of salvage operations, but are to be paid the agreed sum of $3,500 upon delivery of said schooner in Mobile in her present condition, reasonable and necessary damage incurred in salving excepted, but shall be entitled to no compensation unless such delivery is made; it being understood that this is a salvage contract, contingent on success."

The proof further showed that there had been a previous contract between J. M. Scott and one Roberts under the terms of which Roberts agreed to float the vessel for an agreed compensation, and that Roberts after entering upon the performance of his contract abandoned the same without floating the vessel. That Daniel, one of the libelants, was employed as a diver by Roberts and made an examination of the vessel for Roberts, going all around her and examining her condition under the water, and was present when Roberts pumped air into the vessel to see if she could be raised to some extent thereby, and that she was raised some six or eight inches while he was present. Roberts' theory was that he could raise the vessel by pumping air into her and so float her out to deeper water where she could be turned over. Later on, when Daniel was not present, Roberts undertook to raise the vessel in this manner and failed and then abandoned his contract. Thereafter Daniel and Annan entered into the contract above referred to with Scott.

It was shown that both Daniel and Annan knew before entering into the contract that the vessel had been lumber laden. It was further shown that Daniel, when examining the vessel as a diver, ascertained that much of the lumber with which she had been laden was lying on the bottom near the vessel, and some of the lumber was partially under the vessel as she lay upon the bottom. It was further shown that libelants dredged a hole alongside of the vessel and tried to turn her over into this hole which had been so dredged. Upon the first and second attempts the tackle employed by libelants broke. It was claimed by libelants that the increased weight of the vessel by reason of the cargo of lumber in her was what caused the breakage of their tackle and that such tackle would have turned the vessel over, had she not been loaded. Upon the third attempt, the vessel was turned over into the hole and then pumped out and towed to the city of Mobile and delivered to Scott. It was further shown that, when the vessel was turned over, a part of the deck load was still fastened upon her deck, and this, together with the load stored under decks, was brought to Mobile and is the cargo now libeled for salvage.

Both libelants and L. A. Scott, who made the contract for and in the name of J. M. Scott, testified that the cargo was never mentioned specifically during these negotiations. It was testified by one of the libelants that, after the vessel had been righted, he asked J. M. Scott what should be done with the lumber on board, and that J. M. Scott replied that he was not concerned with the cargo, but only with the vessel, and so far as he was concerned they might as well throw it overboard. This testimony was denied by J. M. Scott, who swore that this matter was never mentioned to him or by him. The only other conflict in the testimony is where both L. A. and J. M. Scott testify to inquiries made by them of Daniel as to the condition of the vessel before she was turned over, they claiming that they asked Daniel whether the cargo of lumber had swollen sufficiently to spring or break the vessel, and Daniel stated that this had not happened. Daniel denies these conversations. These are the only two conflicts in the testimony.

The proof showed that the cargo had been surrendered to the insurance company, who accepted and paid for the loss, and that this company sold the lumber to the Moraques Lumber Company, after it had been unloaded, for $2,000, and that the cost of unloading and stacking the lumber upon the wharf, together with the storage on the same was $460, so that the net proceeds of the lumber amounted to $1,540. It was further shown that the insurance company had paid to J. M. Scott their pro rata of the cost of saving the vessel, but that the libelants were not aware of this fact.

It is claimed in this case that no recovery can be had because it is claimed the vessel was raised in her home port. The Emma S. Lord seems to have been from Bangor, Me.; but, regardless of this fact, I think the service was a salvage service. It is further claimed that there can be no recovery in this case because the cargo was inside of and fastened on the deck of the vessel, and that the saving of it was done under a contract which obligated the salvors to save the vessel for a given consideration, and that the vessel could not have been saved without saving the cargo, and this presents to my mind the only real question in the case.

I have examined it with some care, and I have not found any case of exactly the same character. It is undoubtedly true that most of the cargo was loaded in the vessel, and the remainder on deck was saved because it was fastened to the decks and was brought up when the vessel was turned over. Therefore the cargo must have been saved or thrown out at some expense and labor to the salvors. The saving of the cargo cost them absolutely nothing, and under the terms of the contract with Scott, the owner of the vessel, they were to get nothing for saving the vessel unless he saved her, and he could not save the vessel without also saving the cargo. The question therefore arises, whether the cargo saved with the vessel under these conditions can be made to pay salvage, when it was saved with the vessel and without any special independent effort on the part of the salvors.

In the case of The Camanche, 75 U. S. (8 Wall.) 448, 19 L. Ed. 397, I find that the cargo and boat had been turned over to the insurance companies upon its sinking at the wharf, and a contract was made with the insurance companies to save the cargo, and that the cargo was saved as contracted for. It appears that the cargo was valued at about $400,000, and that the insurance covered $34,000, so the owner held a proportion of $60,000, as against the $400,000 valuation. The salvors, having salved the whole cargo and being paid by the insurance companies, filed a libel against the owner to require him to pay for the saving of his proportion of the cargo. The case was litigated, and the Supreme Court held that the owner should pay for saving his proportion of the cargo. It was certain that the cargo could not have been saved under the terms of the contract, without saving the proportionate interest of the owner in such cargo, and hence the proposition in that case and in this one seems to me in principle to be the same.

Looking at the matter from a practical point of view, I cannot see any reason why a cargo should not pay when it has been saved, and it has no concern with the question of whether the salvors had been

paid for saving the boat. The question here is: Did the libelants save the cargo, and it is no answer to say that they saved the cargo while saving the boat, and have been paid for saving the boat. I am therefore of the opinion that libelants should recover. I find, however, that the service rendered was of a very low order, there being no particular risk assumed by the salvors, and I am further influenced to fix the amount at a low figure by reason of the fact that no effort was made to save any part of the cargo, except that which was fastened to the vessel, and necessarily brought up with the vessel when she was turned over; the remainder of the cargo being left on the bottom of the bay, without any effort being made to save the same.

I therefore fix the amount to which libelants are entitled at $150, for which a decree will be entered.